Wayne DOLCEFINO, KTRK Television, Inc., CC Texas Holding Co., Inc., Capital Cities/ABC, Inc., Henry Florsheim, and David Gwizdowski, Appellants,

v.

Cynthia Everett RANDOLPH and Lloyd E. Kelley, Appellees.

No. 14–99–00026–CV.

Court of Appeals of Texas, Houston (14th Dist.).

June 8, 2000.

912

Charles L. Babcock, Leslie Garcia Ashby, David Timothy Moran, Robert Parke Latham, Houston, for appellants.

Ron M. Cohen, Richard D. Raymond, J. Marcus Hill, Houston, for appellees.

Panel consists of Justices YATES, FOWLER and FROST.

## OPINION ON REHEARING

KEM THOMPSON FROST, Justice.

Appellees' motion for rehearing is overruled. This court's opinion issued on February 10, 2000, is withdrawn, and this opinion is substituted in its place.

This is a defamation suit in which appellants, Wayne Dolcefino, KTRK Television, Inc., CC Texas Holding Co., Inc., Capital Cities/ABC, Inc., Henry Florsheim, and David Gwizdowski, all media defendants in the court below, challenge the denial of their motion for summary judgment.[1] In twenty-four points of error, they contend the trial court erred in refusing to render summary judgment that Cynthia Everett Randolph and Lloyd E. Kelley, appellees

and plaintiffs in the court below, take nothing on their defamation claims. We reverse the trial court's judgment and render judgment in favor of appellants.

## I. FACTUAL BACKGROUND

Elected as the City of Houston Controller in 1996, Lloyd Kelley took office in January, 1997. While Kelley was in office, the City awarded the accounting firm of Mir, Fox & Rodriguez ("MFR") a contract to resolve "Y2K" matters, i.e., issues associated with computer problems expected to arise at the beginning of the year 2000. On Kelley's recommendation, MFR subcontracted the Y2K work to Steven C. Plumb, who had served as Kelley's campaign treasurer in his bid to be elected City Controller. In subcontracting the Y2K work to Plumb, MFR neither kept any portion of the payments the City made to Plumb under the subcontract nor retained any supervisory control over Plumb's work for the City.

Wayne Dolcefino, an investigative reporter for KTRK Television, Channel 13, learned of the Plumb subcontract from Larry Homan, an employee in the City Controller's office.[2] Once alerted to this information, Dolcefino began investigating the Plumb subcontract as well as Kelley's work habits as City Controller. In the course of the investigation, Dolcefino's television news team chronicled how the City Controller spent his work days. While making surveillance videotapes of Kelley at various public places, the film crew captured Kelley attending to personal matters during business hours. One surveillance videotape showed Kelley at his home on a summer day installing a

---

1. Appellants bring this interlocutory appeal pursuant to Texas Civil Practice and Remedies Code § 51.014(a)(6), which allows for an accelerated appeal from the denial of a media defendant's motion for summary judgment when the cause of action arises under the free speech or free press clause of the First Amendment to the United States Constitution. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(6) (Vernon Supp.2000).

2. According to Kelley, Homan was a "disgruntled employee" who was working on the election campaign of Kelley's opponent, Sylvia Garcia, during Kelley's upcoming bid for re-election. The only proof supporting this characterization is Kelley's affidavit, which states that Homan was actively working on Sylvia Garcia's campaign.

sprinkler system in his front yard. A second tape showed Kelley on a shopping trip to a local bookstore during work hours. A third surveillance tape showed Kelley spending a workday afternoon at *SplashTown,* a local water park, with Cynthia Randolph, a member of his executive staff. Accompanying Kelley and Randolph on the *SplashTown* outing were Kelley's two children and another child.

In furtherance of his investigation, Dolcefino sought and obtained hundreds of pages of public documents from the City through requests he made under the Texas Public Information Act, including records from the Controller's office and City Finance and Administration Department. Among these documents were the City payroll records on Randolph, which showed that she worked the day of her *SplashTown* outing with Kelley. These payroll records were later changed by the filing of an "exception" to reflect Randolph's afternoon at the water park as vacation time. The change, made in accordance with the City's policies and procedures, was entered four days after KTRK–Channel 13 requested the records, and more than two weeks after the *Splash-Town* outing. In television broadcasts aired on KTRK–Channel 13, Dolcefino reported the *SplashTown* trip, noting both the original omission of any entry in Randolph's payroll records showing the time she took off to accompany Kelley to the water park and the fact that these records were later changed to reflect the time off as vacation time.

### A. Statements to the Public Integrity Review Group

As Dolcefino investigated the Plumb subcontract, he spoke to Officers B.A. Fletcher and S.R. Jett of the Houston Police Department, who were on a task force known as the Public Integrity Review Group or "PIRG." Dolcefino told the officers that there may not have been any work product from Plumb relating to the Y2K subcontract and that the money Plumb received as compensation for his services may have been directed to Kelley's campaign fund. Dolcefino asked the officers to do nothing until after July 16, 1997, the date Plumb's report from his Y2K work was due to be submitted to the City. Nevertheless, the PIRG began an investigation of the matter. Appellants learned of the PIRG's investigation on July 15, 1997, the day before the Plumb report was to issue.

### B. The July 16th Broadcast

On the day Plumb was to submit his report to the City (July 16, 1997), appellants[3] broadcast a story on the subcontract, reporting that KTRK–Channel 13 had learned that the PIRG was asking questions about Kelley. In the broadcast, appellants reported that Plumb began benefitting from government contracts a few months after Kelley became the City Controller and that Plumb had prepared only a three-page report detailing his Y2K work, despite being paid $26,000 for his services.[4] Dolcefino reported that Kelley had helped steer contract money to Plumb, and that MFR had performed no Y2K services under its contract with the City, but instead had passed the Y2K work and all the money to Plumb. During the broadcast, appellants showed excerpts of a taped interview with Gaspar Mir, a principal of MFR, during which Mir stated that MFR had no idea what the City was getting for its money in connection with the Plumb subcontract.

### C. The July 21st Broadcast

Appellants followed up on the July 16th broadcast with another television report

---

**3.** While most of the broadcasts were special reports narrated by Dolcefino, other reporters also participated. At all times, Dolcefino acted as an employee of KTRK–Channel 13. Consequently, except when a specific remark or act is attributable to Dolcefino, we refer to it as the statement or act of the appellants.

**4.** Under the Y2K subcontract, Plumb was to receive a total of $75,000.

on the Plumb subcontract. The story aired on July 21, 1997, the same day Kelley held a press conference. In the broadcast, appellants showed videotaped footage of Kelley at the press conference explaining that Plumb had not been involved in the financial aspects of Kelley's campaign and that there was no wrongdoing in connection with the subcontract. Dolcefino reported that Kelley could not recall if he suggested Plumb for the subcontract. He also reported that Kelley could not identify Plumb's qualifications. In addition, Dolcefino reiterated the assertion from the July 16 th broadcast that Plumb had received $26,000 and had produced only a three-page report. At the end of the July 21 st broadcast, Dolcefino noted that Kelley claimed the police had cleared him of wrongdoing, but Dolcefino remarked that Kelley's statement was inaccurate as the district attorney's office had merely declined to press charges. According to Dolcefino, this action was "[n]ot exactly a clearing of any wrongdoing." Dolcefino also reported that neither the City Attorney nor the City's Finance and Administration Department had responded to Kelley's claims that those groups had conducted an audit and found no wrongdoing.

### D. The July 22 nd Broadcast

Most of the broadcast report aired on July 22, 1997, repeated the information from the story aired the previous day. The report stated that Kelley denied wrongdoing, could not recall whether he suggested Plumb for the subcontract, and could not identify Plumb's qualifications. The July 22 nd broadcast also repeated that the City had paid Plumb $26,000, that Plumb had produced only a three-page report, that Kelley had asked MFR to hire Plumb, and that MFR had passed the contract money to Plumb without reviewing Plumb's work. Appellants closed the broadcast report by noting that although Kelley had been cleared of criminal charges, "the ethics of the matter are still under investigation."

### E. The August 12 th Broadcast

The broadcast appellants aired on August 12, 1997, focused on the surveillance and investigation of Kelley's work habits as City Controller. Appellants described Kelley's *SplashTown* outing with Randolph, his workday installation of a sprinkler system at his home, and his workday visit to a local bookstore with other City employees. The report primarily centered on the *SplashTown* outing, describing how Randolph, a member of Kelley's executive staff, had accompanied him to the water park and that, although she had filled out the appropriate paperwork indicating her vacation time, her paycheck did not reflect the vacation time until over two weeks after the incident. Dolcefino called this record keeping "entirely legal," but noted that the payroll records of every executive with Kelley's office whose records appellants had requested were changed after appellants made the requests. Dolcefino also quoted Randolph as saying that she had never babysat Kelley's children, to which Dolcefino commented: "Apparently, she chose to spend her personal vacation time with the City official who hired her and his children." Dolcefino also stated in the broadcast that he had asked to review Kelley's appointment calendars and schedule books but was told that they were routinely destroyed.

### F. Statements to Newspaper Reporters and City Officials

Dolcefino spoke with Tim Fleck, a reporter for *The Houston Press,* sometime prior to July 24, 1997. An article in that weekly newspaper reported Dolcefino as stating that the airing of Channel 13's malfeasance investigation on Kelley was imminent. Kelley accuses Dolcefino of making similar statements to *Houston Chronicle* reporter Julie Mason, and then Mayor Bob Lanier. He also alleges Dolcefino defamed him in oral communications to the Mayor's Chief of Staff, Joe Wykieth, and the City Attorney, Gene Locke.

## II. PROCEDURAL BACKGROUND

Randolph filed suit in September, 1997. Kelley joined the suit in February, 1998. Both asserted defamation claims arising out of the television broadcasts. In addition, Kelley alleged defamation based on statements Dolcefino purportedly made to the PIRG, the newspaper reporters, the Mayor and other City officials. Both Kelley and Randolph sought to hold appellants KTRK Television, Inc., Capital Cities/ABC, Inc., CC Texas Holding Co., Inc., Henry Florsheim, and David Gwizdowski vicariously liable for Dolcefino's actions by asserting claims of negligent supervision and civil conspiracy.[5]

Appellants filed a traditional motion for summary judgment under Texas Rule of Civil Procedure 166a(b) and, alternatively, a no-evidence motion for summary judgment under Rule 166a(i). As grounds for a traditional summary judgment, appellants asserted that: (1) the statements made the subject of the defamation claims were true, and thus, not defamatory as a matter of law, or were otherwise not actionable; (2) the statements were not published with actual malice; (3) the statements were protected by certain privileges; (4) certain claims were barred by the statute of limitations; and (5) the claims of negligent supervision and conspiracy had no merit. As grounds for a no-evidence summary judgment, appellants, in a lengthy and detailed motion, asserted that Kelley and Randolph had no evidence that any of the alleged defamatory statements were: (1) false; (2) defamatory; (3) of and concerning Kelley and/or Randolph; (4) made with actual malice; (5) published; or (6) resulted in damage. In addition to specifically challenging each of the essential elements of the defamation claims on which Kelley and Randolph would have the burden of proof at trial, appellants also asserted as grounds for their no-evidence motion for summary judgment that Kelley and Randolph had no evidence of each of the elements of their claims for negligent supervision and conspiracy. The trial court denied appellants' motions for summary judgment without stating in its order the basis for the denial.

## III. STANDARD OF REVIEW

We review the denial of a motion for summary judgment by the same standards as the granting of a summary judgment. *See HBO, A Div. of Time Warner Entertainment Co., L.P. v. Harrison,* 983 S.W.2d 31, 35 (Tex.App.—Houston [14th Dist.] 1998, no pet.). Specifically, in reviewing a traditional motion for summary judgment, we take as true all evidence favorable to the non-movant, and we make all reasonable inferences in the non-movant's favor. *See KPMG Peat Marwick v. Harrison County Housing Fin. Corp.,* 988 S.W.2d 746, 748 (Tex.1999). If the movant's motion and summary judgment proof facially establish his right to judgment as a matter of law, the burden shifts to the non-movant to raise a material fact issue sufficient to defeat summary judgment. *See Harrison,* 983 S.W.2d at 35.

We review a no-evidence summary judgment by ascertaining whether the non-movant produced any evidence of probative force to raise a fact issue on the material questions presented. *See Roth v. FFP Operating Partners,* 994 S.W.2d 190, 195 (Tex.App.—Amarillo 1999, pet. denied). We consider all the evidence in the light most favorable to the party against whom the summary judgment was rendered and disregard all contrary evidence and inferences. *See Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex. 1997). The party moving for a no-evidence summary judgment should specifically state the elements as to which there is no

---

**5.** Capital Cities/ABC, Inc. owns CC Texas Holding Co., Inc., which, in turn, is KTRK's parent corporation. Florsheim is KTRK's president and general manager. Gwizdowski is KTRK's former assistant news director.

evidence.[6] *See* Tex.R. Civ. P. 166a(i); *Robinson v. Warner–Lambert & Old Corner Drug*, 998 S.W.2d 407, 409 (Tex.App.—Waco 1999, no pet.). A no-evidence summary judgment is improperly granted if the non-movant presents more than a scintilla of probative evidence to raise a genuine issue of material fact. *See Lampasas v. Spring Center, Inc.*, 988 S.W.2d 428, 432 (Tex.App.—Houston [14th Dist.] 1999, no pet.). More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Havner*, 953 S.W.2d at 711 (citation omitted). Summary judgment, however, must be granted under Rule 166a(i) if the party opposing the motion fails to bring forth competent summary judgment proof. *See Saenz v. Southern Union Gas*, 999 S.W.2d 490, 492 (Tex.App.—El Paso 1999, pet. denied); *Robinson*, 998 S.W.2d at 412.

## IV. Defamation

Appellants contend the statements made in the broadcasts and to the newspaper reporters, City officials, and law enforcement officials were not defamatory as a matter of law, and therefore, the trial court erred in denying their motion for summary judgment.

Defamatory statements read from a script and broadcast constitute libel rather than slander. *See Christy v. Stauffer Publications, Inc.*, 437 S.W.2d 814, 815 (Tex.1969). Libel is a defamatory statement, expressed in written or other graphic form, which tends to injure a person's reputation, "and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation or to publish the natural defects of anyone and thereby expose the person to public hatred, ridicule, or financial injury." Tex. Civ. Prac. & Rem.Code Ann. § 73.001 (Vernon 1997). Whether words are capable of the defamatory meaning the plaintiff attributes to them is a question of law for the court. *See Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 654 (Tex. 1987). In making this determination, we construe the statement as a whole in light of the surrounding circumstances, based upon how a person of ordinary intelligence would perceive the entire statement. *See id.* at 655.

A public official asserting a defamation claim against a media defendant must prove: (1) the defendant published a false statement; (2) which was defamatory to the public official; and (3) the false statement was made with actual malice as to its truth. *See Evans v. Dolcefino*, 986 S.W.2d 69, 76 (Tex.App.—Houston [1st Dist.] 1999, no pet.). A private citizen must prove the same elements, except that she need only show the false statement was made with negligence as to its truth. *See id.*

### A. Truth of Statements

In their first point of error, appellants contend the trial court erred in denying their motion for summary judgment and in refusing to render summary judgment that Kelley and Randolph take nothing from appellants. In four points of error, appellants urge that Kelley and Randolph cannot recover on their defamation claims because there is no evidence that certain of the statements were false and the evidence conclusively establishes that these statements were true. In their second and third points of error, appellants make these contentions in connection with the

---

6. Kelley and Randolph argue that appellants were also required to state that the parties had adequate time for discovery and seem to contend that appellants' failure to do so makes their motion conclusory. As authority, Kelley and Randolph rely on a recent law review article. *See* William J. Cornelius & David F. Johnson, *Tricks, Traps and Snares in Appealing a Summary Judgment in Texas*, 50 Baylor Law Rev. 813 (1998). Texas law, however, does not require such a statement. *See, e.g., Robinson v. Warner–Lambert & Old Corner Drug*, 998 S.W.2d 407, 412 (Tex.App.—Waco 1999, no pet.).

July 1997 broadcasts, and in their eighth and ninth points of error, they make the same contentions in connection with the August 1997 broadcast.

A defendant can defeat a libel claim by establishing the "substantial truth" of the statement. *See McIlvain v. Jacobs*, 794 S.W.2d 14, 15 (Tex.1990). A broadcast is substantially true if the allegedly defamatory statement is not more damaging to the plaintiff's reputation, in the mind of the average person, than the truthful statement. *See id.* at 16. In determining if a broadcast report is substantially true, we look to the "gist" of the broadcast. *See id.* When, as here, a case involves media defendants, the defendants need only prove that third party allegations reported in a broadcast were, in fact, made and under investigation; they need not demonstrate the allegations themselves are substantially true. *See Dolcefino v. Turner*, 987 S.W.2d 100, 109 (Tex. App.—Houston [14th Dist.] 1998, pet. granted).

### 1. The July 16th Broadcast

The gist of the alleged libel in the July 16th broadcast was that (1) Kelley helped his former campaign treasurer, Plumb, obtain a subcontract with the City, (2) Plumb submitted only scant documentation to justify the compensation awarded to him under the subcontract, and (3) MFR, the party with whom the City directly contracted, had little or no involvement in the Plumb subcontract. The gist of the July 16th broadcast is substantially true.

#### a. Kelley's Role in Obtaining the Plumb Subcontract

It is undisputed that Plumb served as Kelley's campaign treasurer.[7] Gaspar Mir of MFR stated in an interview taped before the July 16th broadcast that Kelley had recommended Plumb for the subcon-

tract. The PIRG report supports Mir's statements; it specifically notes that Mir reported Kelley had told him to hire Plumb. The subcontract appended to the PIRG report is evidence that MFR, in fact, hired Plumb. The PIRG report also demonstrates that MFR lacked the experience to perform the Y2K services called for by its contract with the City and that MFR needed to subcontract the Y2K work in order to avoid breaching the contract. This evidence establishes the substantial truth of the statements made with regard to Kelley's role in obtaining Plumb's subcontract.

In an effort to prove the falsity of this matter, Kelley submitted his affidavit, stating: "Defendants broadcast that 'Just a few months after Lloyd Kelley became Houston Controller ... his former campaign treasurer started benefitting with government contracts ...' This was false, defamatory, and has injured me in my profession." Such a conclusory statement is no evidence the matter is false. *See Lewelling v. Lewelling*, 796 S.W.2d 164, 167 n. 5 (Tex.1990). In any event, the summary judgment evidence in the record establishes the statement was true. The PIRG report is proof that Plumb received two City contracts after Kelley was elected—the one at issue in this case and another one Plumb received in March 1996.

#### b. Scant Documentation to Justify Compensation Paid to Plumb

The PIRG report further serves as proof that, as of the date of the July 16th broadcast, Plumb had submitted only a three-page report as his individual work product. Dolcefino's affidavit also proves this fact. It is undisputed that as of the date of the broadcast Plumb received $26,000 from the City for his work on the Y2K subcontract. Based on the summary judgment evidence, we find that the second item (scant docu-

---

**7.** Kelley admits this fact in appellees' brief and also admitted it at his July, 1997 press

conference.

mentation to justify the compensation awarded under the subcontract) is substantially true.

To support his contention that the second item is false, Kelley points to the evidence that, at a later press conference, he produced additional materials purportedly documenting Plumb's work on the subcontract. At the time of the July 16th broadcast,[8] however, this documentation had not been produced. Furthermore, although the videotape of the press conference, held several days later, shows a table covered with documents, the record does not contain any such materials and they were never before the trial court. The evidence in the record is Dolcefino's testimony that he viewed the materials that were made available and that none of them were pertinent to his statement in the July 16th broadcast that there was only one three-page report documenting Plumb's work on the subcontract. This evidence and the PIRG report establish the substantial truth of the statement.

### c. Lack of Involvement by MFR in the Plumb Subcontract

The substantial truth of the third item (lack of involvement by MFR in the Plumb subcontract) is also established by the PIRG report, which states that Houston police officers interviewed MFR principal Carolyn Fox, who stated that MFR was not given supervisory responsibilities over Plumb or his work product. The PIRG's interview with Gaspar Mir, another principal of MFR, is also detailed in the report. Mir stated that the Y2K subcontract directed Plumb to report directly to the City Controller's office. In addition, Mir stated in the broadcast that he had no idea what Plumb had done for the money he had received. Perhaps most importantly, the Plumb subcontract, which is included in the PIRG report, specifically states that "the City Controller shall have the sole

responsibility for approving the scope of [Plumb's] work plan, required fees and hours to be dedicated to each [t]ask." There is no evidence of the falsity of the third item.

### d. Report of the PIRG Investigation

Kelley complains in his response to appellants' motion for summary judgment that appellants reported in the July 16th broadcast that Channel 13 had "learned" the PIRG investigators were asking questions about the Plumb subcontract. According to Kelley, this statement was false because appellants did not *learn* of the investigation, but instead *instigated* it. Kelley points to the PIRG report as support for his contention, noting that the report lists Dolcefino as the complainant.

■ We disagree that the statement was false. Dolcefino stated in his affidavit that he asked the PIRG not to investigate until after the July 16th deadline for Plumb's report. On July 15th, Gaspar Mir told Dolcefino the PIRG was asking questions regarding the Plumb subcontract. The following day, appellants reported that Channel 13 had learned of the PIRG investigation. This statement was an accurate representation because, until that point, appellants only knew that Dolcefino had spoken with the PIRG regarding the Plumb subcontract; they did not know the PIRG had taken any action to investigate until Mir informed Dolcefino of that fact. Furthermore, this statement is not pertinent to the gist of the broadcast, but is a matter of secondary importance. Any variance with respect to matters of secondary importance may be disregarded and the substantial truth of the statements determined as a matter of law. *See McIlvain,* 794 S.W.2d at 16. We find the distinction Kelley makes with respect to appellants' reporting of the PIRG investigation to be immaterial and thus not actionable.

---

**8.** According to Kelley's affidavit, Dolcefino delivered an Open Records Act request on the morning of July 14, 1997. Kelley states in his affidavit that he instructed a member of his staff "to provide all information requested to any member of the media within City policy."

### 2. The July 21st Broadcast

The gist of the July 21st broadcast was that: (1) Kelley held a press conference to address the Plumb matter and denied any wrongdoing in connection with it; (2) Kelley "possibly" was deceptive in connection with the contract because (i) MFR was awarded the contract, (ii) Plumb's name was not on it, (iii) Kelley had recommended Plumb, (iv) MFR subcontracted the work to Plumb but never reviewed it, and (v) Plumb's work product was scant compared to the amount of compensation awarded him under the subcontract; and (3) Kelley could not identify Plumb's qualifications.

The first item is easily disposed of as true because there is no question that Kelley held a press conference and denied wrongdoing. It is clear from the record that the second item is also substantially true. The MFR contract does not contain Plumb's name; Gaspar Mir stated that Kelley had recommended Plumb for the subcontract and that MFR did not, and could not, review Plumb's work. In addition, Mir told the PIRG investigators that MFR was not qualified to carry out its Y2K contract with the City and, therefore, had to subcontract the work. Plumb received $26,000 and provided only a three-page report as his individual work product. From these facts, one could reasonably infer that Kelley possibly deceived the City. We find the statements made in July 21st broadcast to be substantially true. In any case, use of the phrase "possible deception" places this statement in the realm of opinion, which is not actionable as defamation. *See Carr v. Brasher,* 776 S.W.2d 567, 570 (Tex.1989); *Falk & Mayfield L.L.P. v. Molzan,* 974 S.W.2d 821, 824 (Tex.App.—Houston [14th Dist.] 1998, pet. denied).

Kelley argues that Plumb provided more than the three-page report under the subcontract and, therefore, the statement is false. At the press conference, Kelley stated that Plumb was on a committee that produced more substantial work product. Whatever the committee may have produced, it was not Plumb's individual work product, and it was not produced in response to appellants' formal requests for documents.[9] The additional documentation Kelley claims to have produced was not provided until later and, as previously noted, is not in the record.

As for the third item, Kelley contends that Dolcefino's statement during the broadcast that Kelley could not identify Plumb's qualifications was not true and defamed him. The videotape of the press conference contains the following exchange:

Unidentified Speaker No. 2: Lloyd, what is Steve Plumb's special education and background [inaudible]?

Kelley: They have a whole resume on file, which I'm going to ask them to pass out to you. And you can talk to them. They are the ones that worked with him.

Dolcefino: I think we're asking you, do you know what his experience is, since you are the one who recommended him?

Kelley: Would you mind giving him a——

Dolcefino: No, Lloyd, I don't think we need to see press releases. We want to know what you know about his——

Kelley: Wayne, it's all in that document. You can look at it, read it. You'll know. Uh, Gasper Mir knows that he's qualified.

Dolcefino: When Gasper has his press conference, I'll ask him, but I'm asking you.

Kelley: I've answered it.

Dolcefino: Do you know about his——

Kelley: I've answered it. Thank you. I told you. It'll be provided in the doc-

---

9. Dolcefino testified in his deposition that the three-page report was the only report delivered during the operative period and that it was the only report produced pursuant to the appellants' Open Records Act request.

umentation. His qualifications are there. I think they are sufficient. I think if you ask Mary Ann Grant and Bill Stevens and the other members of those committees— he served with several dozens of people in the City— throughout the City. And, uh, other departments were asking him for information, and he was able to help them. And I think, uh, I think he's qualified. I think he did a good job.

Despite repeated inquiries, Kelley did not articulate Plumb's qualifications at the press conference. Instead, he referred reporters to Plumb's resume. This fact cannot be disputed. Dolcefino's statement that Kelley *could not* identify Plumb's qualifications, although not one hundred percent accurate, when measured against the appropriate standard, is not actionable.

 As noted above, "substantial truth" is an absolute defense to a libel action. *See McIlvain,* 794 S.W.2d 14, 15 (Tex.1990); *TSM AM–FM TV v. Meca Homes, Inc.,* 969 S.W.2d 448, 452 (Tex. App.—El Paso 1998, pet. denied); *Barbouti v. Hearst Corp.,* 927 S.W.2d 37, 64 (Tex. App.—Houston [1st Dist.] 1996, writ denied). *See also* TEX. CIV. PRAC. & REM.CODE ANN. § 73.005 (Vernon 1997). A statement is substantially true when the alleged defamatory statement was not more damaging to the claimant's reputation, in the mind of the average listener, than the truthful statement would have been. *See McIlvain,* 794 S.W.2d at 16; *ABC, Inc. v. Shanks,* 1 S.W.3d 230, 234 (Tex.App.— Corpus Christi 1999, pet. denied) (citing *KTRK Television, Inc. v. Fowkes,* 981 S.W.2d 779, 788 (Tex.App.—Houston [1st Dist.] 1998 pet. denied); *Carr v. Mobile Video Tapes, Inc.,* 893 S.W.2d 613, 619 (Tex.App.—Corpus Christi 1994, no writ)). In making the determination as to substantial truth, we look to the "gist" of the statement alleged to be defamatory. *See McIlvain,* 794 S.W.2d at 16; *Shanks,* 1 S.W.3d at 235. Where the facts are undisputed as to the gist of the libelous charge, we disregard any variance regarding items

of secondary importance and determine substantial truth as a matter of law. *See McIlvain,* 794 S.W.2d at 16. "It is not the function of the court to serve as senior editor to determine if the reporting is absolutely, literally, true; substantial truth is sufficient." *See Shanks,* 1 S.W.3d at 235 (quoting *San Antonio Express News v. Dracos,* 922 S.W.2d 242, 249 (Tex.App.— San Antonio 1996, no writ)).

First, we find that Dolcefino's statement that Kelley could not identify Plumb's qualifications was no more degrading, ignominious, or damaging in the mind of the average viewer than the one hundred percent accurate statement would have been. Under these circumstances, the statement actually made (Kelley *could not* identify Plumb's qualifications) is substantially true as a matter of law.

Second, the underlying fact—*that Kelley refused to disclose Plumb's qualifications when asked*—is undisputed and was the "gist" of Dolcefino's statement. That Dolcefino used the phrase "could not" when in actuality Kelley "would not" articulate Plumb's qualifications, is of secondary importance. No matter how Dolcefino phrased it, the gist of the statement was true: *Kelley refused to disclose Plumb's qualifications under questioning from reporters at a press conference.* Because the underlying facts as to the gist of the statement cannot be disputed, we disregard the variance relating to this matter of secondary importance and hold the statement is substantially true for purposes of Kelley's defamation claim.

Third, although Kelley claims that Dolcefino's statement that Kelley *could not* identify Plumb's qualifications was "an attack on Kelley's competence as City Controller," we do not find this statement so egregious that it tends to impeach Kelley's "honesty, integrity, virtue, or reputation" by subjecting him to "public hatred, contempt, or ridicule, or financial injury." TEX. CIV. PRAC. & REM.CODE ANN. § 73.001 (Vernon 1997). Thus, for this additional

reason, we hold the statement is not defamatory as a matter of law.

### 3. The July 22 nd Broadcast

█ The July 22 nd broadcast primarily contained information previously aired. The only new information was that City officials were still looking into the ethics of the Plumb subcontract. The gist of the July 22 nd broadcast was Kelley's denial of wrongdoing and the details of Plumb receiving the subcontract at Kelley's request. For the reasons noted above, the gist of this broadcast was substantially true.

The new information aired on July 22 nd is also substantially true. The PIRG report indicates that Officers Jett and Gillespie met with a representative of the City's Finance and Administration Department about Plumb's time reports on July 23, 1997. Officer Jett and the department representative then met with City Attorney Gene Locke to discuss over $4,600 in unsupported time billed. The PIRG report states that the Finance and Administration Department compared preliminary audits of Plumb's billing records on July 23, 1997. Consequently, when appellants stated on July 22 nd that "officials were still looking into the ethics of the matter," the statement was true. Appellants made a similar remark concerning the ongoing nature of the investigation the previous day, noting that the district attorney's decision not to press criminal charges was "[n]ot exactly a clearing of any wrongdoing." This statement is also substantially true. According to the PIRG report, investigators discovered thirty-three hours for which Plumb billed but provided no support, an amount equal to $4,620. The district attorney's office, having determined the matter was a contractual dispute and therefore a civil rather than a criminal matter, did not file charges. Nonetheless, as Dolcefino accurately reported, no City agency had determined that Kelley was free from wrongdoing; and, given the lack of support for Plumb's billing, one could reasonably infer that Plumb may have act-ed improperly in charging the City for his services.

### 4. The August 12 th Broadcast

The gist of the August 12 th broadcast was that: (1) appellants performed surveillance on Kelley which revealed Kelley was not in his office during regular business hours, and instead appeared to be tending to *personal matters*; (2) appellants were unable to review Kelley's calendars and schedule books because these items were routinely destroyed; (3) City payroll records for Randolph, a member of Kelley's executive staff, who was videotaped spending a workday afternoon at *SplashTown* with Kelley and his children, did not reflect Randolph's vacation time for this outing; (4) time records for other City employees whose records appellants asked to review were changed after appellants asked for the records; and (5) appellants insinuated Randolph and Kelley were involved in a personal relationship.

#### a. Defamation as to Randolph

█ Because Randolph is not a public figure, we conduct a separate review to determine whether the August 12 th broadcast was defamatory as to her. As a private citizen asserting a defamation claim, Randolph need only prove the allegedly false statement was made with negligence as to its truth. *See Evans v. Dolcefino*, 986 S.W.2d 69, 76 (Tex.App.—Houston [1st Dist.] 1999, no pet.).

The first, second, and fourth items made the subject of the August 12 th broadcast are not germane to Randolph. Turning to the third item (the *SplashTown* outing), we note that Randolph and Kelley do not dispute that they went to *SplashTown* together on July 3, 1997. The surveillance videotape clearly captures them together, clad in swim wear, at the water park. The summary judgment proof established that the City paid Randolph for working eight hours that day and deducted four vacation hours on July 18 th on an "exception pay timesheet." In other words, Randolph re-

ceived a paycheck that did not reflect time off for her afternoon at *SplashTown*, and only in the next pay period were those vacation hours deducted. Based on this proof, we find the third item is substantially true. Randolph's summary judgment proof that her leave request and time sheet were filled out in accordance with City policy and procedure does not negate the truth of what appellants reported. Her claim that Dolcefino knew that it was the City Finance and Administration Department, rather than the City Controller's office, that changes payroll is not germane to the gist of the broadcast, and is, therefore, a matter of secondary importance. Disregarding any variance in this matter of secondary importance,[10] we find these statements in the August 12 th broadcast to be substantially true.

The fifth item, the insinuation of a personal relationship between Kelley and Randolph, arises from the following broadcast statements spoken by Dolcefino:

> And while Cynthia Randolph doesn't tell us what she was doing at *SplashTown* that day, she says, 'I have never babysat Lloyd Kelley's children.' Apparently, she chose to spend her personal vacation time with the City official who hired her and his children.

While these statements may imply a personal relationship between Randolph and Kelly, the underlying facts are true. Randolph admits that she made the statement about never having babysat Kelley's children. Although she argues that appellants quoted her statement out of context, this fact is not germane to whether the statement is true. In addition, Randolph's payroll records indicate that her afternoon at *SplashTown* was, in fact, vacation time, and she does not dispute that she was there with Kelley and his children, as shown on the videotape.

Randolph's summary judgment proof included an affidavit from a private citizen who stated the broadcast gave the impression that Randolph and Kelley were involved in an extramarital affair. A mere implication of a personal relationship between Kelley and Randolph cannot be the basis for a defamation claim. *See generally Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex.1995) (finding "truth is a complete defense to defamation."). Because the underlying facts reported are true, this affidavit is no proof that the statements made were false; rather, it merely establishes a possible inference that could be drawn from the broadcast.

#### b. Defamation as to Kelley

All portions of the August 12 th broadcast relating to Randolph also relate to Kelley. Having established that those portions are true or substantially true, they are not defamatory as to Kelley. We now consider the items in the August 12 th broadcast relating only to Kelley.

Turning to the first item (tending to personal matters during work days), appellants' videotape of the August 12 th broadcast shows Kelley: (1) clad in very casual attire, in the front yard of his residence installing a sprinkler system; (2) at his home on another workday, again dressed in informal attire, getting into a car with two other City employees and driving to a local bookstore; and (3) on the *SplashTown* outing. Kelley does not point to any proof to refute the truth of these matters.

■ As for the second item (destruction of calendars and schedule books), the only summary judgment proof that Kelley's appointment calendars and schedule books were routinely destroyed was Dolcefino's statement to that effect in the August 12 th broadcast and Dolcefino's affidavit testimony that he believed all statements in that broadcast were true. This proof does not establish that the statements are true. Nevertheless, appellants asserted in the broadcast that, like every elected official, "Kelley ... is not

**10.** *See McIlvain,* 794 S.W.2d at 16.

required to keep an official record of his time or a particular schedule." The statement regarding the destruction of calendars and schedule books was not so egregious that it tends to impeach Kelley's honesty, integrity, virtue, or reputation by subjecting him to "public hatred, contempt, or ridicule, or financial injury,"[11] especially in light of the caveat enunciated in the broadcast. Consequently, we find the second item is not defamatory as a matter of law.

In addition, we note that even though appellants did not offer competent summary judgment proof regarding the truth of the statement concerning the routine destruction of calendars and schedule books, we may consider whether appellants were entitled to summary judgment under the no-evidence standard applicable to Rule 166a(i). Kelley offered no evidence to refute the truth of the statement. His failure to do so merits the granting of appellants' motion under Rule 166a(i) as to defamation regarding that portion of the broadcast.[12] *See Saenz v. Southern Union Gas Co.,* 999 S.W.2d 490, 492 (Tex.App.—El Paso 1999, pet. denied) (holding that motion for summary judgment must be granted if party opposing motion fails to bring forth competent summary judgment proof); *Robinson v. Warner–Lambert & Old Corner Drug,* 998 S.W.2d 407, 409 (Tex.App.—Waco 1999, no pet.).

The fourth item (change of other City employees' time records) can be addressed in similar fashion. Appellants offer as proof a videotape of the August 12th broadcast in which Dolcefino states, "the payroll records of every Controller's office exec we wanted to talk to was changed after we asked for records; vacation hours were always added. In a letter they told us this was all done in accordance with City policy." Further proof is Dolcefino's affidavit testimony that he believed all statements in the August 12th broadcast were true. While appellants' proof on this matter does not warrant the granting of their traditional motion for summary judgment, like the statement regarding routine record destruction, this statement could not subject Kelley to hatred, ridicule, contempt or financial injury, especially given the caveat enunciated in the broadcast that the changes to payroll records were made in accordance with City policy. Therefore, we find this statement is not defamatory as a matter of law. Furthermore, because Kelley offered no evidence to refute the truth of this statement, he could not avoid summary judgment under Rule 166a(i).

### 5. Statements to the Newspaper Reporters

Kelley also accuses appellants of defamation in connection with statements Dolcefino allegedly made to newspaper reporters Tim Fleck and Julie Mason. Dolcefino allegedly commented to each of these reporters that he was doing a series on "malfeasance."[13] Kelley argues this statement is defamatory *per se* because malfea-

---

11. Tex. Civ. Prac. & Rem.Code Ann. § 73.001 (Vernon 1997).

12. Kelley complains that appellants are not entitled to a no-evidence summary judgment, as their motion was conclusory and "never discussed adequate time for discovery." There is no requirement that the motion state there has been adequate time for discovery. *See* Tex.R. Civ. P. 166a(i). More importantly, appellants specified the claims and elements that could not be supported by the evidence and, therefore, their motion was not conclusory.

13. Kelley's affidavit states that Mason wrote an editorial in the *Houston Chronicle* regard-ing the Plumb subcontract. Additionally, the affidavit states that when Kelley asked her where she got the idea Plumb was funneling subcontract money to Kelley's campaign, she responded that "[Kelley] needed to talk to Dolcefino and that apparently he was not finished with the Plumb story and that he told her he would be doing a series of stories on malfeasance in the Controller's Office." Kelley also states "Tim Fleck of the *Houston Press* quoted Mr. Dolcefino as saying he was doing a story on malfeasance regarding me and my office." Kelley offers no other evidence of the statements.

sance is an illegal deed, and accusing another of an illegal deed is defamatory. *See Stearns v. McManis,* 543 S.W.2d 659, 661–62 (Tex.Civ.App.—Houston [1st Dist.] 1976, writ dism'd).

Appellants first attack the admissibility of these statements, arguing the trial court should have sustained their hearsay objections to them. An objection that an affidavit contains hearsay is an objection to form, and therefore must be asserted in the trial court. *See Green v. Industrial Specialty Contractors, Inc.,* 1 S.W.3d 126, 130 (Tex.App.—Houston [1st Dist.] 1999, no pet.); *St. Paul Ins. Co. v. Mefford,* 994 S.W.2d 715, 721 (Tex.App.—Dallas 1999, pet. denied). Appellants objected that the statements by the newspaper reporters were hearsay in the trial court; however, in order to preserve error, it was incumbent upon appellants to obtain a ruling or a refusal to rule on their objections. *See Green,* 1 S.W.3d at 130. The record reflects that appellants filed their objections to summary judgment evidence well in advance of the court's ruling. The judge who heard the motion for summary judgment denied it on December 15, 1998, without addressing the objections to the summary judgment evidence. More than two months later, on February 24, 1999, a different judge signed an order refusing to rule on the objections. Although appellants objected to the refusal to rule, Kelley points out that they did not obtain a ruling or refusal to rule until after the trial court entered the order denying summary judgment.

While Rule 166a does not expressly require the trial court to rule on objections to summary judgment evidence before ruling on the motion itself, this sequencing is implicit in summary judgment practice. *See, e.g., Morton v. GTE North, Inc.,* 922 F.Supp. 1169 (N.D.Tex. 1996) (interpreting federal counterpart to Rule 166a, Federal Rule of Civil Procedure 56, holding objections to summary judg-ment evidence should be ruled upon before court rules on motion), *aff'd,* 114 F.3d 1182 (5th Cir.), *cert. denied,* 522 U.S. 880, 118 S.Ct. 205, 139 L.Ed.2d 141 (1997). Where timely filed objections to summary judgment evidence are before the trial court at the time it rules on a motion for summary judgment, we presume the court ruled on the objections before deciding the merits of the summary judgment motion; otherwise, the court would not know which evidence to consider in making its ruling. When a trial court does not *disclose* its rulings on summary judgment evidence, generally neither the parties nor the reviewing court know whether the objections were sustained or overruled.

The general rule requiring the party asserting the objection to obtain a ruling or a refusal to rule in order to preserve error,[14] presents special challenges in summary judgment practice, where motions can be and often are decided without oral hearing or any other face-to-face encounter with the trial judge. The ultimate ruling on the summary judgment motion may fail to address the objections, even though the trial court is presumed to have ruled on them as a threshold step in determining the propriety of summary judgment. That is precisely what happened here.

Appellants timely submitted proposed orders on their objections to Kelley's summary judgment evidence and diligently followed up by setting their objections on the court's submission docket, yet the trial court ruled on the summary judgment motion without disclosing its rulings on the objections and without a clear refusal to do so. Application of the general waiver rule under such circumstances is problematic because it results in unpreserved error even for parties with conscientious counsel who exercise diligence in making objections and seeking rulings from the trial court. Moreover, it spawns fictional constructs, such as the one presented by this

14. Tex.R. Civ. P. 33.1(a).

record in which parties who timely asserted objections prior to the court's ruling on the motion go back after the fact and obtain a "refusal" to rule on the very objections the court presumptively ruled on before deciding to deny the motion.

 For reasons not apparent in the record, the judge who signed the order refusing to rule on appellants' objections to the summary judgment evidence was not the judge who ruled on the summary judgment motion. The second judge, not having heard the motion, understandably refused to rule on the objections to the evidence proffered in opposition to it. While the appellants sought and obtained the "refusal" to rule for the legitimate purpose of preserving error for appeal, we cannot sanction this procedure. The underlying rationale for Texas Rule of Appellate Procedure 33.1(a) is to ensure that the trial court has the opportunity to rule on matters for which the parties later seek review in the appellate court. It does not effectuate the purpose of this rule to ask a judge who did not rule on the motion for summary judgment to make rulings on evidence proffered in support or opposition to it when another judge already has heard and denied the motion. Absent special or compelling circumstances, the judge who rules on the motion for summary judgment should also rule on the objections to the evidence. Trial judges have a duty to rule on all such objections, and, because they are presumed to have done so before ruling on the motion itself, the practice of obtaining a "refusal" from a different judge creates the anomalous situation of having both an undisclosed ruling from the judge who heard the motion and a refusal to rule from another judge on the same objections.

 We believe the better practice is for the trial court to disclose, in writing, its rulings on all objections to summary judgment evidence at or before the time it enters the order granting or denying summary judgment. Practitioners should facilitate this procedure by incorporating all parties' objections to summary judgment evidence in proposed orders granting or denying summary judgment and including a "Mother Hubbard" recitation to encompass any objections not otherwise addressed in the proposed orders. This practice will direct the trial court's attention to the matter, and serve as a reminder to the court to disclose its rulings on all objections to summary judgment evidence at the time it issues its ruling on the summary judgment motion. Following this practice becomes especially critical where the trial court takes the motion under advisement or rules on it without an oral hearing because, in such cases, there is no live forum in which to insist on disclosure of the court's rulings on the objections prior to the court's ruling on the motion. In any context, however, it is incumbent upon the party asserting objections to obtain a written ruling at, before, or very near the time the trial court rules on the motion for summary judgment or risk waiver. *See* TEX.R.APP. P. 33.1(a)

 While we find the trial court presumptively ruled on appellants' objections to Kelley's summary judgment evidence, we are unable to determine from this record whether the objections were sustained or overruled because there is no order disclosing the court's rulings. The "refusal" to rule, signed by a judge who did not hear the motion for summary judgment and who entered the "refusal" order more than two months after the motion was denied, is of no import and fails to preserve error. If the trial judge who denied the motion refused to disclose her rulings on the summary judgment evidence, that refusal would be tantamount to a refusal to rule and sufficient to preserve error.[15]

15. Because we presume that a trial judge has ruled on any objections to summary judgment evidence before ruling on the motion for summary judgment, a true "refusal" to rule arises

only in the rarest of cases. The problem is usually not a refusal to rule but rather a failure to *disclose* the rulings.

However, it is not possible to make that determination from the record now before us. Unlike other courts faced with similar situations, we cannot infer from the record in this case that the trial court implicitly overruled or implicitly sustained appellants' objections.[16]

■ First, we will assume *arguendo* that error was preserved and consider whether the statements alleged to constitute hearsay were admissible. We begin by noting that hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted. *See* TEX.R. EVID. 801(d). The statements allegedly uttered by the newspaper reporters about what Dolcefino allegedly told them were made out of court and repeated by Kelley. Kelley offered the reporters' statements to establish that Dolcefino told Mason and Fleck that he was doing a story on Kelley's malfeasance. Because Kelley is seeking to establish a defamation claim based on what Dolcefino allegedly said to these newspaper reporters, for purposes of the hearsay analysis, the crucial inquiry is whether Dolcefino made the remarks, not whether Dolcefino was actually doing a story on malfeasance or whether Kelley committed malfeasance. Kelley clearly offered the statements of these out-of-court declarants to establish the truth of the matters asserted, i.e., to prove Dolcefino said these things to Mason and Fleck. As such, the statements are hearsay. A trial court may not consider hearsay evidence in ruling on a motion for summary judgment. *See Ho v. University of Texas at Arlington,* 984 S.W.2d 672, 680 (Tex. App.—Amarillo 1998, pet. denied); *Fidelity & Cas. Co. of New York v. Burts Bros., Inc.,* 744 S.W.2d 219, 224 (Tex.App.— Houston [1st Dist.] 1987, no writ). Thus, it would constitute error for the trial court to have considered these statements in ruling on appellants' motion for summary judgment.

■ Next, we assume for purposes of argument that appellants failed to preserve error with respect to the hearsay objections so that the statements Dolcefino allegedly made to the newspaper reporters are part of the summary judgment evidence before us on appeal. Operating under this assumption, we find these statements could not form the basis of a defamation claim because, if made,[17] they were true and thus not defamatory. In making the determination as to the truth of these statements, we look at the meaning of "malfeasance" and consider the context in which the statements were made. "Malfeasance" is defined as "wrongdoing or misconduct by a public official." BLACK'S LAW DICTIONARY 968 (7th ed.1999). Dolcefino allegedly told the reporters that he was doing a series of stories on malfeasance. Because Dolcefino, in fact, did a series of broadcasts, the subject of which

16. Before the new Texas Rules of Appellate Procedure took effect on September 1, 1997, "a party objecting to summary judgment evidence had to obtain a written ruling on the objection or to have a lack of a ruling." *Frazier v. Yu,* 987 S.W.2d 607, 609 (Tex.App.-Fort Worth 1999, pet. denied). Rule 33.1(a), which replaced former Rule 52(a), relaxed the requirement of an express ruling and recognized implied rulings. *See id.* at 610. Under this substantive change, error is preserved "as long as the record indicates in some way that the trial court ruled on the objection either expressly or implicitly." *Id.* At least one of our sister courts of appeals has found that the existence of written objections and a recitation that the court reviewed all competent evidence, creates an inference that the trial court implicitly sustained objections to sum-

mary judgment evidence. *See id.; see also Blum v. Julian,* 977 S.W.2d 819, 823–24 (Tex. App.-Fort Worth 1998, no pet.) (finding that granting summary judgment created an inference that the trial court implicitly reviewed and overruled objections to an affidavit offered in support of the motion).

17. Although Dolcefino denies speaking to Mason before he began the television broadcasts, and also denies making the statement about malfeasance to Fleck, in conducting our review, we take as true all evidence favorable to the non-movant (Kelley) and, therefore, we assume the statements were made. *See KPMG Peat Marwick v. Harrison County Housing Fin. Corp.,* 988 S.W.2d 746, 748 (Tex.1999).

was the wrongdoing or misconduct of a public official (City Controller) in the performance of his duties, any such statements were true, and thus, could not form the basis of a defamation claim.

### 6. Statements to Law Enforcement Officials

■ Kelley contends appellants defamed him in making several statements to law enforcement officials about the Plumb subcontract. Specifically, Kelley claims that Dolcefino told the PIRG officers that (1) he believed Plumb was funneling funds back into Kelley's campaign account; (2) he did not believe Plumb had performed any work under the subcontract but had received $75,000; and (3) there was a conflict of interest.[18] To support these defamation claims, Kelley relies on the PIRG report, which states:

> Dolcefino stated that he received information that Mr. Kelley required a contractor, Mir, Fox, & Rodriguez to issued [sic] a $75,000 subcontract to Mr. Plumb for computer consulting work on the System 2000 Project. *Mr. Dolcefino stated he believed Mr. Plumb was then funneling those funds back into Mr. Kelley's campaign account.* Mr. Dolcefino also stated he had been unable to identify a work product by Mr. Plumb, despite a report being due on July 15, 1997. (emphasis added).[19]

We hold appellants were entitled to summary judgment relative to the statements made by Dolcefino to law enforcement officials because (1) the statements were substantially true, and (2) none of the statements were made with actual malice.

The first and last sentences of the quoted portion of the PIRG report are substantially true, as noted in discussion of the broadcasts. The second sentence, italicized above, is also true—Dolcefino's affidavit states he had been told the money being paid to Plumb may have been directed to Kelley's campaign account. In addition, Dolcefino stated in his pretrial deposition that individuals in the City Controller's office raised the issue of money being funneled back into Kelley's campaign. Kelley produced no competent summary judgment evidence contradicting Dolcefino's affidavit or his pretrial deposition. Because the complained of statements in the PIRG report were substantially true, appellants were entitled to summary judgment relative to these statements. *See McIlvain,* 794 S.W.2d at 15.

In addition, even if the statements were not substantially true, appellants produced evidence that Dolcefino did not have any information that would have led him to believe the statements he made were false, and he did not have any reason to doubt the truth of the information. In other words, appellants produced evidence sufficient to prove as a matter of law that Dolcefino's statements were made without actual malice.

■ To recover for defamation, a public figure or public official, such as Kelley, must prove the defendant published a false and defamatory statement with actual malice. *See Huckabee v. Time*

---

18. While we note that Dolcefino denies making certain of the statements attributed to him, in conducting our review, we take as true all evidence favorable to the non-movant (Kelley) and, therefore, we assume the statements were made. *See KPMG Peat Marwick,* 988 S.W.2d at 748.

19. A very similar statement in the PIRG report reads:

> On or about June 23, 1997, Mr. Dolcefino reported obtaining information that Mr. Kelley issued a contract to his campaign treasurer, Steven Plumb, for $75,000 which

> was being funneled back into Mr. Kelley's campaign ... Mr. Dolcefino stated a report was due by July 15, 1997, but his sources were telling him there was no work product.

These statements are virtually the same; both are based on statements Dolcefino purportedly made to PIRG officers concerning the information he had obtained on the Plumb subcontract. Accordingly, our analysis and discussion apply equally to both statements.

*Warner Entertainment Co., L.P.,* 43 Tex. Sup.Ct. J. 674, 677–78, 19 S.W.3d 413 (Tex. 2000) (citing *WFAA–TV, Inc. v. McLemore,* 978 S.W.2d 568, 571 (Tex.1998); *Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex. 1989); *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). "Actual malice" in a defamation case is a term of art. *See Huckabee,* 43 Tex. Sup.Ct. J. at 677. Unlike common-law malice, it does not include ill-will, spite, or evil motive. *See id.; Casso v. Brand,* 776 S.W.2d 551, 558 (Tex. 1989). Rather, to establish actual malice, a plaintiff must prove the defendant made the statement "with knowledge that it was false or with reckless disregard of whether it was true or not." *See Huckabee,* 43 Tex. Sup.Ct. J. at 677 (quoting *New York Times,* 376 U.S. at 279–80, 84 S.Ct. 710). "Reckless disregard" is also a term of art. *See Huckabee,* 43 Tex. Sup.Ct. J. at 677, 19 S.W.3d 413. To establish "reckless disregard," the public official or public figure must prove the publisher entertained serious doubts as to the truth of the publication in question. *See id.* (citing *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)).

■ A defendant can obtain summary judgment if he conclusively negates one element of the plaintiff's claim. *See Phan Son Van v. Pena,* 990 S.W.2d 751, 753 (Tex.1999); TEX.R. CIV. P. 166a(c). A defendant in a defamation suit can negate actual malice as a matter of law by presenting evidence that he did not publish the statement with knowledge of its falsity or reckless disregard for its truth. *See Huckabee,* 43 Tex. Sup.Ct. J. at 677. Once a defendant produces evidence negating actual malice as a matter of law, the burden shifts to the claimant to present controverting proof raising a genuine issue of material fact. *See Phan Son Van,* 990 S.W.2d at 754; TEX.R. CIV. P. 166a(c).

Dolcefino stated in his affidavit that at the time he spoke with PIRG officials, he had no information to indicate that the information he had received was false and no reason to doubt its veracity. Because this affidavit is from an "interested witness," it will negate actual malice as a matter of law only if it is "clear, positive, and direct, otherwise credible and free from contradictions and inconsistencies, and [capable of being] readily controverted." *See Huckabee,* 43 Tex. Sup.Ct. J. at 680 (quoting TEX.R. CIV. P. 166a(c)). In actual malice cases, this type of affidavit must establish the defendant's belief in the challenged statements' truth and prove a plausible basis for this belief. *See Huckabee,* 43 Tex. Sup.Ct. J. at 680. Based on our review of the entire Dolcefino affidavit, we find it satisfied the Rule 166a(c) requirements. Thus, we find appellants negated actual malice as to the statements in the PIRG report as a matter of law.

Once appellants produced this evidence, the burden shifted to Kelley to present controverting proof raising a genuine issue of material fact. *See id.* Taking the direct and circumstantial evidence Kelley presented as true, and indulging all reasonable inferences in his favor, we find that he failed to come forward with competent summary judgment proof that Dolcefino made the statements to the PIRG officials in reckless disregard of whether they were true or that Dolcefino knew the statements made to the PIRG officials were false at the time he made them.[20] Accordingly, we hold appellants were entitled to summary judgment as to the statements contained in the PIRG report.

Though we have held appellants were entitled to traditional summary judgment based on actual malice with regard to the statements in the PIRG report, we also find they were entitled to judgment based

---

**20.** Kelley contends the statement regarding the funneling of funds back into Kelley's campaign account is false because only Larry Homan (Dolcefino's contact in the City Controller's office), not "people," made this state-ment to Dolcefino. We find this distinction to be a matter of secondary importance. As such, we can disregard it and determine the substantial truth of the statement as a matter of law. *See McIlvain,* 794 S.W.2d at 16.

on their no-evidence motion for summary judgment on the same grounds. In their no-evidence motion, appellants alleged there was no evidence of actual malice. In response to this motion, Kelley failed to come forward with any competent summary judgment proof sufficient to raise a fact issue on this element of his *prima facie* case. Accordingly, appellants were entitled to summary judgment, relative to statements in the PIRG report, based on their no-evidence motion for summary judgment.

### 7. Statements to City Officials

 Kelley contends Dolcefino defamed him to various City officials, including former Mayor Bob Lanier, the City Attorney, Gene Locke, and the Mayor's Chief of Staff, Joe Wykeith. Kelley relies on his own affidavit testimony to support the defamation claims. At the outset, we note that the conclusory statements Kelley makes throughout his affidavit are not proper summary judgment evidence. "A conclusory statement is one that does not provide the underlying facts to support the conclusion. Conclusory statements in affidavits are not proper as summary judgment proof if there are no facts to support the conclusions." *Rizkallah v. Conner*, 952 S.W.2d 580, 587 (Tex.App.—Houston [1st Dist.] 1997, no writ). Kelley's affidavit is fraught with conclusory statements.[21] The trial court could not properly consider any of these conclusory statements in denying appellants' motion for summary judgment. Accordingly, we do not consider such statements in addressing the specific comments Dolcefino allegedly made to each of the City officials.

#### a. Statements to Former Mayor Bob Lanier

 In his affidavit, Kelley states:

Mayor Lanier told me that Wayne Dolcefino had been following me and that he was going to do a story on me that I had given a contract to my campaign manager "Blum" and was funneling money back to my campaign account.... The Mayor also stated that Wayne Dolcefino claimed to have film of Hispanic workers from my office doing yard work or mowing the grass at my house during work hours.

Appellants allege these statements in Kelley's affidavit constitute hearsay. As with appellants' other hearsay objections, we presume the trial court ruled on these objections, but it is not possible to determine from the record now before us whether the court implicitly overruled or implicitly sustained them.

 First, we will assume that appellants preserved error on their hearsay objections and consider whether these statements were admissible. Kelley offers the statements to establish the truth of the matter asserted, i.e., that Dolcefino uttered these allegedly defamatory statements to former Mayor Lanier. As such, these statements are clearly hearsay. *See* TEX.R. EVID. 801(d). Notably, Kelley's affidavit does not establish that *he* heard the statements allegedly uttered by Dolcefino, but rather that Mayor Lanier, an out-of-court declarant, told Kelley that he (Mayor Lanier) had heard them. The truth of whether Dolcefino, in fact, made these allegedly defamatory statements would depend on the credibility of the out-of-court declarant (Mayor Lanier). Consequently, Kelley's affidavit testimony purporting to establish what Dolcefino said to Mayor Lanier is inadmissible hearsay. Therefore, it would constitute error for the trial

---

21. For example, the statement "this was false and defamatory and has injured me in my profession" appears several times in Kelley's affidavit, along with numerous other conclusory statements, e.g., "Many of the statements made by defendants during their investigation and broadcasts defamed me and were untrue and without any factual basis;" ... "I have been damaged in my reputation both professionally and personally." ... "Defendants' actions were a proximate cause of my losing the election for City Controller." ... "Defendants' allegations were false and defamatory."

court to have relied on these hearsay statements in denying appellants' motion for summary judgment. *See Ho*, 984 S.W.2d at 680; *Burts Bros.*, 744 S.W.2d at 224. More importantly, given the hearsay nature of the statements Dolcefino is alleged to have made to Mayor Lanier, there is no competent summary judgment evidence of an essential element of a cause of action for defamation—that Docefino *published* the statements Kelley attributes to him.

If we assume that appellants waived their objections to the hearsay statements contained in Kelley's affidavit and view these statements as summary judgment evidence, the analysis changes, but the result remains the same. The first statement Dolcefino purportedly made to Mayor Lanier (that Dolcefino had been following Kelley and preparing a story concerning the Plumb contract and money allegedly funneled back to Kelley's campaign) is not defamatory because it is true. *See McIlvain*, 794 S.W.2d at 15. The July 16th broadcast did, in fact, concern the possibility that Plumb had funneled money to Kelley's campaign, and the August 12th broadcast showed appellants had been following Kelley.

As to the second statement (that Dolcefino had film of Hispanic workers from Kelley's office working in Kelley's yard during office hours), appellants moved for summary judgment pursuant to Rule 166a(i), alleging that Kelley could not establish specific elements of his *prima facie* case. *See* Tex.R. Civ. P. 166a(i). Thus, it was incumbent upon Kelley, in responding to appellants' no-evidence motion for summary judgment, to bring forth competent summary judgment proof to raise a genuine issue of material fact on each of the challenged elements. *See id.* Kelley did not meet this burden on two separate elements—falsity of the statement and reckless disregard as to its truth. To establish the statement was false, Kelley submitted his own affidavit. In that affidavit, Kelley merely recited his conversation with former Mayor Lanier. He did not, however, deny that Dolcefino had film of Hispanic workers doing his yard work. Thus, appellants were entitled to judgment because Kelley failed to bring forth competent summary judgment proof to raise a genuine issue of material fact on the issue of falsity. Moreover, Kelley did not produce even a scintilla of probative evidence in response to appellants' no-evidence motion on the element of actual malice to show that Dolcefino knew the statements made to former Mayor Lanier were false or that he acted with reckless disregard as to the truth of the statements. *See Huckabee*, 43 Tex. Sup.Ct. J. at 680. Thus, appellants were entitled to summary judgment on this basis as well.

### b. *Statements to City Attorney*

■ Kelley also contends that appellants defamed him to City Attorney, Gene Locke. According to Kelley's affidavit testimony, Dolcefino called Locke in August, 1997, and "asked him what he would do if it were brought to his attention that people in the Controller's Office were altering government records." This statement does not mention Kelley or Randolph. Furthermore, the statement does not affirmatively indicate that anyone altered government records; rather, it is in the form of a hypothetical question, posed without reference to any particular person or any particular record. Because appellants attacked appellees' claims on the basis that there was no evidence of a defamatory statement "of and concerning Kelley and Randolph," it was incumbent upon Kelley and Randolph to come forward with more than a scintilla of probative evidence to raise a fact issue on this element of their *prima facie* case. *See* Tex.R. Civ. P. 166a(i). Kelley and Randolph failed to show that this statement was "of and concerning" them and thus appellants were entitled to summary judgment under Rule 166a(i) on this defamation claim.

### c. Statements to Mayor's Chief of Staff

Kelley also asserts in his suit that Dolcefino made allegations regarding the Plumb subcontract to former Mayor Lanier's Chief of Staff, Joe Wykeith. Neither Kelley's affidavit nor anything else in the summary judgment record contains any evidence of such a statement. In order to defeat appellants' Rule 166a(i) motion based on this allegedly defamatory statement, Kelley had to come forward with proof sufficient to raise a fact issue with respect to each of the specific elements of his *prima facie* case appellants challenged, including that Dolcefino made a false statement to Wykeith regarding the Plumb subcontract that concerned Kelley, and was defamatory to him. *See id.* Kelley failed to do so. Therefore, Kelley could not avoid summary judgment on this defamation claim under Rule 166a(i).

We sustain points of error one, two, three, eight, and nine.

### V. Other Claims

In points of error 19, 20 and 23, appellants challenge the trial court's refusal to grant summary judgment on Randolph and Kelley's causes of action for negligent supervision and conspiracy by the appellants to defame them. Causes of action for negligent supervision and conspiracy depend entirely on the validity of appellees' defamation claims. *See KTRK Television v. Felder*, 950 S.W.2d 100, 108 (Tex.App.—Houston [14th Dist.] 1997, no writ) (holding that claims grounded entirely on defamation claim are precluded when defamation claim has no merit because the statements are substantially true). Because we hold that appellants did not defame Kelley or Randolph, we find their claims based on negligent supervision and conspiracy are without merit. We sustain points of error 19, 20, and 23.

Inasmuch as our holding is dispositive of all other issues appellants have raised, we need not address the remaining points of error.

### VI. Conclusion

Having determined with respect to each claim of defamation that appellants negated an essential element of appellees' causes of action for defamation and/or that appellees failed to meet their burden under Rule 166a(i) in responding to appellants' no-evidence motion for summary judgment, we find that appellants are entitled to summary judgment on the defamation claims. Absent any claim for defamation, the appellees' claims for negligent supervision and conspiracy also fail. Accordingly, we reverse the trial court's denial of appellants' motion for summary judgment and render judgment for appellants that appellees take nothing.