Affirmed and Memorandum Opinion filed July 13, 2004









Affirmed and Memorandum Opinion filed July 13, 2004.

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-03-00600-CV

____________

 

VOGELBUSCH
USA, INC., Appellant

 

V.

 

STATE
FARM LLOYDS AND STATE FARM FIRE & CASUALTY COMPANY, Appellees

_______________________________________________________________________

 

On Appeal from the 189th District Court

Harris County, Texas

Trial Court Cause No. 02-38881

_______________________________________________________________________

 

M E M O R A N D U M   O P I N I O N








In this insurance-coverage
declaratory-judgment case, we must decide whether the trial court erred in
granting summary judgment that the insurers under a commercial general
liability policy and a commercial umbrella policy have no duty to defend their
insured in regard to a counterclaim asserted against the insured by a purchaser
of the insured=s product.  At issue are the policies=
products-completed-operations-hazard exclusions.  Finding that the counterclaim alleges facts
that clearly fall within these unambiguous policy exclusions, we affirm the
trial court=s judgment.

I.  Factual and
Procedural Background

Archer Daniels Midland Company
(hereinafter the APlant
Owner@) owns and operates an alcohol plant in
Peoria, Illinois.  This plant produces Ahigh purity beverage grade alcohol@ based on a fermentation
process.  The Plant Owner contracted with
appellant Vogelbusch USA, Inc. for Vogelbusch to engineer and design a high purity
ethanol dehydrator to be installed at this alcohol plant.  According to the Plant Owner, this dehydrator
was to receive Araw alcohol@ produced by the Plant Owner=s existing distillation process and
produce dehydrated, beverage-quality alcohol as well as byproduct that could be
used again in the plant=s distillation process. 
Vogelbusch proceeded to engineer and design a high purity ethanol
dehydrator, which was installed at the Plant Owner=s Illinois plant.  However, the Plant Owner claims
that the dehydrator did not produce beverage-grade ethanol because of the presence
of a contaminant C diethyl
ether C in the
finished product.  

Asserting that the Plant Owner
had not paid Vogelbusch all sums owed under the contract, Vogelbusch filed a
breach-of-contract action against the Plant Owner in the Circuit Court of Cook
County, Illinois.  The Plant Owner
answered and asserted a counterclaim against Vogelbusch, alleging claims for
breach of contract, negligent misrepresentation, breach of implied warranty of
merchantability, and breach of implied warranty of fitness for a particular
purpose.  








Vogelbusch is the insured under
(1) a commercial general liability insurance policy (ACGL
Policy@) issued
by appellee State Farm Lloyds and (2) a commercial umbrella insurance policy (AUmbrella
Policy@) issued
by appellee State Farm Fire & Casualty Company .  The CGL Policy and the Umbrella Policy
covered Vogelbusch during the time period relevant to the Plant Owner=s
counterclaim.  After these insurers
(collectively referred to hereinafter as AState
Farm@) refused
to defend Vogelbusch or admit coverage under their policies, Vogelbusch filed
suit against them alleging breach of contract and seeking a declaratory
judgment that State Farm has a duty to defend and indemnify Vogelbusch against
the Plant Owner=s
counterclaim.  State Farm answered,
asserting that there is no duty to defend or indemnify based on exclusions in
the insurance policies.

After hearing cross-motions for
summary judgment filed by both Vogelbusch and State Farm, the trial court
denied Vogelbusch=s motion
and granted State Farm=s motion,
determining that the insurers owe Vogelbusch no duty to defend or indemnify
against the allegations contained in the Plant Owner=s
counterclaim.  In this appeal, Vogelbusch
asserts the trial court should have granted its motion for summary judgment.

II.  Standard
of Review

A summary-judgment movant must
establish its right to summary judgment on the issues presented to the trial
court by conclusively proving all elements of the movant=s claim
or defense as a matter of law.  See
Tex. R. Civ. P. 166a(c); Havlen
v. McDougall, 22 S.W.3d 343, 345 (Tex. 2000).  When both parties move for summary judgment,
each party must carry its own burden, and neither can prevail because of the
failure of the other to discharge its burden. 
INAC Corp. v. Underwriters at Lloyd=s, 56
S.W.3d 242, 247 (Tex. App.CHouston
[14th Dist.] 2001, no pet.).  Because
each party was a movant, the burden for each was the same: to establish
entitlement to a summary judgment by conclusively proving all the elements of
the claim or defense as a matter of law. 
Id.  When both sides move
for summary judgment and the trial court grants one motion and denies the
other, the appellate court must review all summary‑judgment evidence,
determine all issues presented, and render the judgment that the trial court
should have rendered.  FM Props.
Operating Co. v. City of Austin, 22 S.W.3d 868, 872 (Tex. 2000).  This court reviews the summary‑judgment
evidence using familiar standards of review. 
See Dolcefino v. Randolph, 19 S.W.3d 906, 916 (Tex. App.CHouston
[14th Dist.] 2000, pet. denied). 








III.  Analysis

To
resolve this insurance-coverage dispute, we apply the rules of contract
construction.  See Kelley‑Coppedge,
Inc. v. Highlands Ins. Co., 980 S.W.2d 462, 464 (Tex. 1998).  In applying these rules, our primary concern is to ascertain the
parties= intent as expressed in the language
of the policy.  See id.  In determining the intention of the parties,
we look only within the four corners of the insurance agreement to see what is
actually stated, and not what was allegedly meant.  See Esquivel v. Murray Guard, Inc.,
992 S.W.2d 536, 544 (Tex. App.CHouston [14th Dist.] 1999, pet. denied).  We must consider all of the provisions with
reference to the entire contract; no single provision will be controlling.  Coker v. Coker, 650 S.W.2d 391, 393
(Tex. 1983).  If a written contract is so
worded that it can be given a definite or certain legal meaning, then it is
unambiguous, and we may not accept parol evidence as to the parties= intent.  Kelley‑Coppedge, 980 S.W.2d at
464.  Whether a contract is ambiguous is
a question of law.  Id.








In analyzing insurance-coverage disputes of this nature, we
look first to the policy and then to the pleading to determine if coverage
exists.  If a pleading does not allege
facts within the scope of coverage, an insurer is not legally required to
defend a suit against its insured.  Nat=l Union Fire Ins. Co. v. Merchs. Fast
Motor Lines, Inc.,
939 S.W.2d 139, 141 (Tex. 1997).  We
determine State Farm=s duty to defend based on the allegations of the Plant Owner=s counterclaim and the language of
the insurance policy.  See id.  This standard for determining coverage from
the four corners of the pleading and the four corners of the insurance policy
is referred to as the Aeight corners@ rule.  See id.  Applying the Aeight corners@ rule, we give the allegations in the
Plant Owner=s counterclaim a liberal
interpretation.  See id.  If the counterclaim does not state facts
sufficient to bring the case clearly within or without the coverage, the general
rule is that the insurer is obligated to defend if potentially there is
a case under the counterclaim within the coverage of the policy.  See id. 
In making this determination, we must focus on the counterclaim=s factual allegations that show the
origin of the damages rather than on the legal theories alleged.  See id.  We will not read facts into the Plant Owner=s counterclaim, nor will we look
outside of the counterclaim, or imagine factual scenarios which might trigger
coverage.[1]  See id. at 142. 

A.        What are the terms of the insurance-policy exclusions at
issue in this case?

The CGL Policy excludes from
coverage Aproperty damage to your
work arising out of it or any part of it and included in the products-completed
operations hazard.@[2]  The CGL Policy contains, in pertinent part,
the following definitions[3]:

products-completed
operations hazard:

a.         includes all bodily injury and property
damage arising out of your product or  your work except products that are
still in your physical  possession or
work that has not yet been completed or abandoned.  The bodily injury or property
damage must occur away from premises you own or rent unless your business
includes the selling, handling or distribution of  your product for consumption on
premises you own or rent.

Your work will be deemed completed
at the earliest of the following times:

(1)       when all of the work called for in your
contract has been completed;








(2)       when all of the work to be done at the
site has been completed if your contract calls for work at more than one site;
or

 

(3)       when that part of the work done at a job
site has been put to its intended use by any person or organization other than
another contractor or subcontractor working on the same project.

Work that may need
service, maintenance, correction, repair or replacement, but which is otherwise
complete, will be treated as completed . . . .

. . . 

your product:

a.         means:

(1)       any goods or products, other than real
property, manufactured, sold, handled, distributed or disposed of by . . . you
. . . and

(2)
      containers (other than vehicles),
materials, parts or equipment furnished in connection with such goods or
products;

b.         includes:

(1)       warranties or representations made at any
time with respect to the fitness, quality, durability, performance or use of
any of the items included in a.(1) and a.(2) above; and

(2)       the providing of or failure to provide
warnings or instructions . . . .

your work:

a.         means:

(1)       work or operations performed by you or on
your behalf; and

(2)
      materials, parts or equipment
furnished in connection with such work or operations;

b.         includes:








(1)       warranties or representations made at any
time with respect to the fitness, quality, durability, performance or use of
any of the items included in a.(1) and a.(2) above; and

(2)       the providing of or failure to provide
warnings or instructions.

The Umbrella Policy does not
apply to any activity or operation defined as AProducts
Hazard@ in the
policy.  The Umbrella Policy defines AProducts
Hazard,@ in
pertinent part, as follows:

(1)       the handling or use of or the existence
of any condition in or a warranty of goods or products manufactured, sold,
handled or distributed by the Named Insured or by others trading under its
name, if the occurrence happens after possession of such goods or products has
been relinquished to others by the Named Insured or by others trading under its
name and if such occurrence happens, away from premises owned by, rented to or
controlled by the Named Insured . . .   ;
or

(2)       operations, including any act or omission
in connection with operations performed by or on behalf of the Named Insured on
the premises or elsewhere and whether or not goods or products are involved in
such operations, if the occurrence happens after such operations have been
completed or abandoned and happens away from premises owned by, rented to or
controlled by the Named Insured provided, operations shall not be deemed
incomplete because improperly or defectively performed or because further
operations may be required pursuant to an agreement. . . .

We conclude that the relevant
portions of the insurance policies are unambiguous.  See Kelley‑Coppedge, Inc., 980
S.W.2d at 464B67.  These policies exclude coverage for the Plant
Owner=s
counterclaim if the alleged property damage was allegedly caused by a product
that Vogelbusch allegedly no longer possessed or by work Vogelbusch allegedly
had completed. The CGL Policy states that Vogelbusch=s work is
considered completed when Athat part
of the work done at a job site has been put to its intended use by any person
or organization other than another contractor or subcontractor working on the
same project.@








B.        Does the Plant Owner allege that its property damage was caused by a product
that Vogelbusch no longer possessed or by work Vogelbusch had
completed?

Based on the unambiguous policy
language, we review the Plant Owner=s
counterclaim to see if it alleges that the Plant Owner=s
property damage was caused by a product that Vogelbusch no longer possessed or
by work Vogelbusch had completed.  The
Plant Owner=s counterclaim contains the
following material allegations:

1.         [The Plant Owner] . . . is a Delaware corporation which owns
and operates a [sic] alcohol plant in Peoria, Illinois (APeoria facility@).

2.         At all relevant times, the Peoria facility was in the
ethanol dehydration industry which includes the production of Ahigh purity beverage grade
alcohol@ based upon a fermentation
process.

. . . 

4.         On or about December 9, 1996, Vogelbusch sent a proposal to
[the Plant Owner] for a 60MMGPY molecular sieve dehydrator to be designed and
installed at the Peoria facility . . . . As part of that proposal Vogelbusch
agreed to design and install a high purity ethanol dehydrator which was to
receive Araw alcohol@ from the Peoria facility=s existing distillation
process and produce Adehydrated alcohol,@ with the byproduct to be
returned to the existing distillation process. 
Based upon subsequent discussions between [the Plant Owner] and
Vogelbusch in late December, the parties agreed that the dehydration system was
intended to produce high purity ethanol, maintaining the beverage grade quality
of the raw alcohol.  

5.         On or about January 9, 1997 [the Plant Owner] issued a
purchase order to Vogelbusch for the design, installation and construction of
the molecular sieve dehydration system to remove water from beverage grade
alcohol at the Peoria facility.  The
purchase order specified that the system would be installed at the Peoria
facility as described above. . . . 

6.         Pursuant to the Vogelbusch proposal and subsequent
discussions between [the Plant Owner] and Vogelbusch, Vogelbusch accepted the
purchase order, and agreed to perform the engineering, design and installation
of the molecular sieve dehydration system, and to provide a high purity ethanol
dehydrator to meet 100 parts per million (ppm) water content at a flow rate of
60MMGPY based on continuous operation for a 350-day year, which would produce
high purity ethanol, maintaining the beverage grade quality of the raw alcohol.








7.         Vogelbusch began to perform services and to provide designs,
specifications, and equipment as described in the proposal and purchase order.

8.         Pursuant to the advice and specifications of Vogelbusch, on
March 14, 1997, [the Plant Owner] contracted with UOP Molecular Sieve to
provide the molecular sieve which would be the component part to the
dehydration system. . . .

9.         The Vogelbusch dehydration system designed, engineered,
and sold by Vogelbusch was inadequate and failed to provide high purity
beverage grade ethanol as described above because of the presence of diethyl
ether in the finished product.  By
April of 1997 the Vogelbusch dehydration system and the molecular sieve
provided by UOP were generating a diethyl ether contaminant in the finished
ethanol product resulting from the dehydration process.

10.       Vogelbusch breached its contract by manufacturing, designing,
installing and selling a molecular sieve dehydration system which was
inadequate and failed to provide high purity beverage grade ethanol because of
the presence of diethyl ether contaminate [sic] in the finished product as
described above.

11.       As a proximate result of Vogelbusch=s breach of contract, [the
Plant Owner] had to repair and modify the system and lost profits due to
decreased production and increased costs of production.

12.       As a proximate result of Vogelbusch=s breach of contract, [the
Plant Owner] continued to run the system turning premium beverage grade alcohol into
a finished product which was fit only for sale as a fuel at prices
substantially lower than the value of high purity beverage grade ethanol, and
continued to lose time during which it could have been producing ethanol which
sold at a premium. . . .

. . .

16.       [The Plant Owner] realleges and incorporates by reference
Paragraphs 1-15 as if same were set forth fully herein.

17.       By April of 1997, Vogelbusch was aware that the dehydration
system it had manufactured, designed, installed and sold would not produce
high purity beverage grade ethanol, but rather would generate an unacceptable
diethyl ether contaminate [sic] in the finished ethanol product.








18.       Vogelbusch negligently misrepresented that the diethyl ether
contaminant could be Aflushed@ out of the system through
[the Plant Owner=s] continued operation of the dehydration system.  

19.       Vogelbusch knew or had reason to know that the diethyl ether
could not be Aflushed@ out of the system based
on other plants in Pekin and France with similar systems and the same resultant
problem of diethyl ether in the finished product.  Vogelbusch had a duty to disclose the
problems with diethyl ether contaminate [sic] in the finished product at other
plants and to advise [the Plant Owner] that the contaminate [sic] could not be Aflushed@ out as represented.

20.       Vogelbusch advised [the Plant Owner] to continue to operate
the dehydration system despite the resulting diethyl ether contaminate in
the finished ethanol product.

21.       [The Plant Owner] justifiably relied on Vogelbusch in continuing
to run the system turning premium beverage grade alcohol into a finished ethanol
product which was fit only for sale as a fuel.

22.       As a proximate result of Vogelbusch=s negligent
misrepresentation, [the Plant Owner] had to repair and modify the system and
lost profits due to decreased production and increased costs of production.

23.       As
a proximate result of Vogelbusch=s
negligent misrepresentation, [the Plant Owner] continued to run the system
turning premium beverage grade alcohol into a finished product which was fit
only for sale as a fuel at prices substantially lower than the value of high
purity beverage grade ethanol, and continued to lose time during which it could
have been producing ethanol which sold at a premium. . . .   (emphasis added).








In adjudicating this appeal, we
determine only whether the Plant Owner=s
counterclaim alleges facts
within the scope of coverage; we are not concerned with the truth or falsity of
these factual allegations.  See Nat=l Union Fire Ins. Co., 939 S.W.2d at 141; Argonaut
Southwest Ins. Co. v. Maupin, 500 S.W.2d 633, 635B36 (Tex. 1973) (holding that the Aduty to defend is determined by the
allegations of the petition when considered in the light of the policy
provisions without reference to the truth or falsity of such allegations@ and that A[t]he duty to defend does not depend
on what the facts are, or what might be determined finally by the trier
of facts@).  The Plant Owner makes the following
allegations, among others, in its counterclaim:

!         By April of 1997, the Vogelbusch system and the molecular
sieve provided by UOP were generating the alleged contamination in the Plant
Owner=s finished ethanol
product.[4]


            !         As a result of Vogelbusch=s manufacturing,
designing, installing, and selling an inadequate dehydration system, the Plant
Owner continued to run the system.[5]

!         Vogelbusch had manufactured, designed, installed, and sold
the dehydration system in question by April of 1997.[6]


!         Vogelbusch negligently represented that
the alleged contaminant could be flushed out of the dehydration system through
the Plant Owner=s
continued operation of the system, and the Plant Owner justifiably relied on
this representation in continuing to run the system.[7]  








The Plant Owner=s
counterclaim alleges that Vogelbusch=s work or
its dehydration system caused property damage to Vogelbusch=s
alcohol; however, the Plant Owner alleges that this damage occurred after
Vogelbusch had transferred possession of the dehydration system to the Plant
Owner and after Vogelbusch had completed its work by putting the system to its
intended use by the Plant Owner.[8]  Though we liberally construe the counterclaim
to determine if it alleges facts within the coverage of the insurance policies,
we do not read facts into the counterclaim, and we cannot look outside the
counterclaim or imagine factual scenarios that might trigger coverage.[9]
 See Nat=l Union Fire Ins. Co., 939 S.W.2d at 141B42; Clemons v. State Farm Fire
and Cas. Co., 879 S.W.2d 385, 392B93 (Tex.
App.CHouston
[14th Dist.] 1994, no writ).  Even giving
the counterclaim a liberal construction, we conclude the facts alleged therein
clearly fall within the above-quoted exclusions in the insurance policies.[10]  See Nat=l Union
Fire Ins. Co., 939 S.W.2d at 141B42; Clemons, 879 S.W.2d at 392B93; see
also LaBatt Co. v. Hartford Lloyd=s Ins.
Co., 776 S.W.2d 795, 798B99 (Tex.
App.CCorpus
Christi 1989, no writ) (holding that insurer had no duty to defend because
allegations in underlying suit fell within the Aproduct
hazard@
exclusion in the insurance policy). 
Thus, there is no duty to defend in this case.








Vogelbusch relies heavily on a
Texas case that states Awe find
authority supporting the view that the >completed
operations= exclusion does not apply in
cases in which the damage or injury arises in connection with the sale or
distribution of a product by an insured.@  Colony Ins. Co. v. H.R.K., Inc., 728
S.W.2d 848, 851 (Tex.
App.CDallas 1987, no writ).  Although this case involved a
products-completed-operations-hazard exclusion, the insurance policy provisions
at issue and the allegations in the underlying litigation in the Colony
Insurance case differ significantly from those involved in the case
currently before us.  See id. at 849B51.  The Colony Insurance case is
distinguishable and is not inconsistent with our resolution of the present
case.  Furthermore, to the extent
Vogelbusch argues that the Colony Insurance case announces a holding applicable
to all products-completed-operations-hazard exclusions regardless of their
wording, we reject that argument as contrary to Texas law.  See Nat=l Union Fire Ins. Co., 939 S.W.2d at 141 (holding
that duty-to-defend analysis is based on language of the pleading and the
insurance policy at issue). 

We conclude that the trial court
correctly granted State Farm=s motion
for summary judgment and correctly denied Vogelbusch=s motion
for summary judgment.  Accordingly, we
overrule Vogelbusch=s sole
issue on appeal and affirm the trial court=s judgment.

 

/s/        Kem Thompson Frost

Justice

 

Judgment rendered and Memorandum Opinion filed July 13, 2004.

Panel consists of Justices Edelman, Frost, and Guzman.

 











[1]  For this
reason, we do not consider evidence extrinsic to the policies and the
counterclaim, for example, the summary-judgment affidavit signed by Gunter
Brodl, President of Vogelbusch, or exhibits attached to Vogelbusch=s complaint in the Illinois state court
proceeding.  See Nat=l Union Fire Ins. Co., 939 S.W.2d at 141; Gomez v. Hartford Co. of the
Midwest, 803 S.W.2d 438, 441 (Tex. App.CEl Paso
1991, writ denied).  No party to this
appeal has asserted that any alleged exception to the Aeight corners@ rule
applies to this case; therefore, we need not address whether any such exception
exists or, if so, whether it applies to this case.  See Collier v. Allstate Cty. Mut. Ins. Co.,
64 S.W.3d 54, 59 n.3 (Tex. App.CFort Worth 2001, no pet.).





[2]  Emphasis in
original.





[3]  No emphasis
has been added to the quoted policy language; all terms in bold are as they
appear in the insurance policies.  





[4]  See Paragraph 9 of the Plant
Owner=s counterclaim supra.






[5]   See id. at Paragraphs 10, 12. 





[6]  See id. at Paragraph 17.   





[7]  See id. at Paragraphs 18, 20,
21, 23.  

 





[8]  To fall within
the exclusions in question, the alleged occurrence made the basis of the suit
must also have happened away from premises owned by, rented to, or controlled
by Vogelbusch.  The counterclaim alleges
that the occurrence took place at the Plant Owner=s Peoria
facility when the Plant Owner was operating the dehydration system in
question.  Therefore, the allegations
satisfy this additional requirement of the policy exclusions.





[9]  Although a
Purchase Requisition form attached to the Plant Owner=s counterclaim states that the Adelivery date desired@ for the
UOP molecular sieve is AMay 1997,@ this
form is dated March 14, 1997, and does not state that UOP delivered the sieve
in May 1997.  This document indicates UOP
delivered the sieve after March 14, 1997; however, it was created before
delivery and provides no evidence of when UOP actually delivered the
sieve.  Likewise, in the counterclaim,
the Plant Owner bases one of its damage calculations on a single price for
high-purity beverage-grade alcohol Ain late
1997.@  This could be
when the Plant Owner sold some or all of the allegedly contaminated
alcohol.  In any event, this allegation
does not conflict with the other factual allegations showing that the
counterclaim falls within exclusions in the insurance policies.





[10]  The trial
court stated in its judgment that State Farm owes no duty to defend or
indemnify Vogelbusch against the allegations in the Plant Owner=s counterclaim. 
The Texas Supreme Court has held that, under certain circumstances, an
insurer=s duty to indemnify may be adjudicated before the
underlying litigation is resolved.  See
Farmers Tex. Cty. Mut. Ins. Co. v. Griffin, 955 S.W.2d 81, 84 (Tex.
1997).  The trial court=s ruling on indemnity was limited to the counterclaim
in question and any judgment based thereon. 
Furthermore, Vogelbusch argued in the trial court that, under the Griffin
case, the indemnity issue is ripe for adjudication.  On appeal, Vogelbusch has not argued that, if
State Farm has no duty to defend, then the trial court improperly reached the
indemnity issue.  The propriety of the
trial court=s indemnity ruling under Griffin is not before
this court.