COURT OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-05-105-CV

 

 

LYDIA H. GROTTI, M.D.                                                       APPELLANT

 

                                                   V.

 

BELO CORPORATION, D/B/A BELO;                                         APPELLEES

WFAA-TV, L.P., D/B/A
WFAA-TV 

(CHANNEL 8) AND WFAA-TV
CO.; 

WFAA OF TEXAS, INC.; 

AND
VALERI WILLIAMS                                                                        

 

                                              ------------

 

            FROM THE 67TH
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------








This is a libel case involving the alleged
publication of defamatory content during multiple television broadcasts.  Appellant Lydia H. Grotti, M.D. appeals the
trial court=s granting of summary judgment
in favor of Appellees Belo Corporation, d/b/a Belo; WFAA-TV, L.P., d/b/a
WFAA-TV (Channel 8) and WFAA-TV Co.; WFAA of Texas, Inc.; and Valeri Williams (AMedia
Defendants@). In seven issues, Dr. Grotti
argues that the trial court erred by granting the summary judgment.  She complains only about the summary judgment
as it pertains to her defamation claims. 
Because we hold that the Media Defendants established the substantial
truth of each broadcast by accurately reporting third-party allegations and
investigations, we affirm.

I.  Factual and Procedural Background

The summary judgment evidence shows that sometime
during the summer of 2000, a physician working at John Peter Smith Hospital (AJPS@)
contacted WFAA-TV to express concern over patient wait times and understaffing
in the emergency room.  Valeri Williams,
a reporter for WFAA-TV, and Meridith Shucker, a producer for WFAA-TV,
researched various conditions at JPS, and in October 2000, WFAA-TV aired its
first report on patient wait times and other concerns at JPS.  This initial broadcast subsequently caused a
number of JPS nurses to contact Williams and relate their concerns to her
regarding, among other things, insufficient staffing, equipment failure, and
medical mistakes at JPS.  WFAA-TV aired a
second report on JPS on November 8, 2000 regarding some of these concerns.








Williams and Shucker continued researching JPS
and eventually learned about the deaths of Lettie McGhee and Charles O=Keefe,
former JPS patients.  Through their
research, which included discussions with family members of McGhee and O=Keefe,
they learned that Dr. Grotti had allegedly removed McGhee from a life support
system without consulting McGhee=s family
and that O=Keefe had died from a morphine
overdose while under Dr. Grotti=s care. 

Beginning in the summer of 2001, Williams and
Shucker investigated numerous reports and allegations involving Dr. Grotti and
the circumstances surrounding the deaths of McGhee and O=Keefe as
part of their continuing investigation into JPS, including the following:

Texas Department of Health Report:  Williams and Shucker obtained a Texas
Department of Health (ATDH@) report
that concluded in part that the ICU physician (Dr. Grotti) had disconnected
McGhee from a ventilator and discontinued life-sustaining drugs without first
speaking with McGhee=s spouse or representative.  Willliams and Shucker spoke with various JPS
personnel about McGhee=s death, and a few of them
related that McGhee continued to breathe on her own for about an hour after Dr.
Grotti had disconnected her from the ventilator and pronounced her dead.  Williams further learned that Grotti had
occluded McGhee=s endotracheal (AET@) tube
by placing her thumb over it.  In
September 2001, Williams acquired a written statement which included Dr. Grotti=s
admission that she had occluded McGhee=s ET
tube approximately one hour after she pronounced McGhee dead.








Tarrant County Medical Examiner=s
Autopsy Report:  Williams
and Shucker obtained the Tarrant County Medical Examiner=s
official autopsy report for O=Keefe,
which indicated that O=Keefe died of acute morphine
intoxication by accident.  Upon
re-investigation, the medical examiner later identified O=Keefe=s death
as a homicide.

Fort Worth Police Department (AFWPD@)
Investigation:  Williams
and Shucker learned that homicide detectives with the FWPD were conducting a Aserious
investigation@ of Dr. Grotti and her
involvement in the deaths of McGhee and O=Keefe.  Williams conducted an on-camera interview
with a FWPD lieutenant confirming this fact.

Independent Prosecutor:  In the summer of 2001, Williams and Shucker
learned that an independent prosecutor had been appointed to handle the
criminal prosecution against Dr. Grotti. 
Both had conversations with the special prosecutor in which he confirmed
that there was a homicide investigation of Dr. Grotti.

JPS Investigation:  During their investigation, Williams and
Shucker also learned that JPS, through a peer review committee, was
investigating Dr. Grotti for her involvement in the deaths of McGhee and O=Keefe.  JPS ultimately suspended Dr. Grotti from the
hospital in June 2001, just before WFAA=s first
broadcast in which Dr. Grotti was mentioned.








Texas State Board of Medical Examiners=
Investigation:  Williams
and Shucker learned that the Texas State Board of Medical Examiners was
investigating Dr. Grotti=s involvement in the deaths of
McGhee and O=Keefe. The Board of Medical
Examiners temporarily suspended Dr. Grotti=s
medical license effective August 14, 2002 in an order that included detailed
findings of fact and conclusions of law, including findings that Dr. Grotti
pronounced McGhee dead while McGhee was on ventilator support, that Dr. Grotti
removed McGhee from ventilator support but McGhee continued spontaneous
respirations through her ET tube, and that Dr. Grotti acknowledged that she had
occluded McGhee=s ET tube with her thumb,
causing all spontaneous respirations to stop. 
The temporary order further concluded that Dr. Grotti=s Acontinuation
in the practice of medicine would constitute a real and present danger to the
health of [her] patients and a continuing threat to the public welfare.@  By an order signed on October 28, 2003, after
Williams and Shucker had left WFAA-TV, the Board of Medical Examiners revoked
Dr. Grotti=s medical licence and ordered
that she immediately cease the practice of medicine in Texas.  A Travis County district court subsequently
affirmed the Board of Medical Examiners= order
revoking Dr. Grotti=s medical license.








Doctors=
Opinions and Conclusions:  During
their investigation, Williams and Shucker asked other JPS doctors and a
forensic pathologist to review O=Keefe=s
medical file.  They also asked the
doctors for their opinions regarding McGhee=s
death.  Three of them concluded that Dr.
Grotti had euthanized O=Keefe by giving him an overdose
of morphine and that occluding McGhee=s ET
tube would have suffocated her.  A fourth
doctor, after only a cursory review of the file, believed that Dr. Grotti=s
actions were highly suspicious.   McGhee
and O=Keefe Families=
Allegations and Lawsuits: 
Williams and Shucker interviewed the families of McGhee and O=Keefe on
numerous occasions (sometimes on-camera) regarding the deaths of their family
members. McGhee=s daughters expressed doubt and
anger concerning the circumstances surrounding Dr. Grotti=s
treatment of McGhee.  Members of McGhee=s family
subsequently brought a wrongful death suit against Dr. Grotti, alleging that
McGhee was still alive when Dr. Grotti discontinued treating her and that Dr.
Grotti occluded McGhee=s ET tube in order to stop her
respirations.  Members of O=Keefe=s family
likewise questioned Dr. Grotti=s
treatment of O=Keefe, expressing doubt
primarily about Dr. Grotti=s use of
morphine in her treatment of O=Keefe.  The O=Keefe
family also sued Dr. Grotti, alleging that she ordered that a lethal dose of
morphine be administered to O=Keefe.








Criminal Proceedings:  A Tarrant County grand jury indicted Dr.
Grotti for McGhee=s murder in October 2003.  In 2004, a jury convicted Dr. Grotti of
criminally negligent homicide, and, having affirmatively found that she used
her finger as a deadly weapon during the commission of the offense, assessed
her punishment at two years=
confinement.  Dr. Grotti=s
conviction is currently on appeal.

Between June 28, 2001 and August 15, 2002,
WFAA-TV aired a number of investigative reports (described in detail below)
covering patient care and concerns at JPS and the circumstances surrounding the
deaths of McGhee and O=Keefe.  Dr. Grotti was mentioned in all of the
reports except the initial broadcast.








Dr. Grotti sued the Media Defendants over the
televised broadcasts, alleging that they contained false and defamatory
statements about her.  The Media
Defendants moved for summary judgment on both traditional and no-evidence
summary judgment grounds, arguing that the challenged broadcasts are
substantially true because they contain accurate accounts of third-party
allegations, that the broadcasts are privileged, that Dr. Grotti is a public
official and a limited purpose public figure, and that Dr. Grotti=s Atag
along@ claims
(conspiracy to defame and intentional infliction of emotional distress) fail as
a matter of law.  The Media Defendants
further filed a supplemental motion for summary judgment arguing that Dr.
Grotti was collaterally estopped from relitigating Awhether
Ms. McGhee was alive when Dr. Grotti occluded her endotracheal tube and whether
Dr. Grotti caused a patient=s death.@  The Media Defendants also filed extensive
objections to portions of Dr. Grotti=s
summary judgment evidence, which the trial court sustained in part and
overruled in part. The trial court granted the Media Defendants= motion
and supplemental motion in their entirety and signed a final judgment
dismissing Dr. Grotti=s claims with prejudice.  Dr. Grotti argues on appeal that she is not
collaterally estopped from bringing her libel action, that the trial court
erred by excluding portions of her summary judgment evidence, that the WFAA-TV
broadcasts were not substantially true or privileged, that she is not a public
figure, and that the Media Defendants acted with malice.

II.  Standard of Review

Because the Media Defendants brought both
traditional and no-evidence motions for summary judgment and raised the
affirmative defense of substantial truth, and because a no-evidence motion for
summary judgment cannot be granted on an affirmative defense, which the
asserting party has the burden of pleading and proving as a matter of law,[1]
we set forth only the traditional motion for summary judgment standard of
review and analyze the Media Defendants= defense
in that context.








In a summary judgment case, the issue on appeal
is whether the movants met the summary judgment burden by establishing that no
genuine issue of material fact exists and that the movants are entitled to
judgment as a matter of law.[2]  The burden of proof is on the movants, and
all doubts about the existence of a genuine issue of material fact are resolved
against the movants.[3]  Therefore, we must view the evidence and its
reasonable inferences in the light most favorable to the nonmovant.[4]

A defendant is entitled to summary judgment on an
affirmative defense if the defendant conclusively proves all the elements of
the affirmative defense.[5]  When the trial court does not specify the
ground upon which it based its ruling, as in the instant case, the summary
judgment will be affirmed on appeal if any of the theories advanced are
meritorious.[6]

 








III.  Defamation

In her fourth issue, Dr. Grotti contends that the
WFAA-TV broadcasts were not substantially true. 
She argues that the Media Defendants defamed her during the multiple
television broadcasts by accusing her of murdering McGhee and O=Keefe.  She contends that the facts Awere
deliberately manipulated and juxtaposed to sensationalize the story@ and
that the gist of the resulting broadcasts was that she was euthanizing or
intentionally killing patients at JPS and getting away with it.  Dr. Grotti maintains that the statements made
during the broadcasts are thus actionable because she was later acquitted in
her criminal trial of intentionally euthanizing or intentionally killing
McGhee.

The Media Defendants respond that the trial court
properly granted summary judgment because they accurately reported third-party
allegations and investigations involving Dr. Grotti, thus establishing the
substantial truth of each broadcast=s Agist.@  The Media Defendants state, 

Grotti also tries to
bypass . . . well-established case law by arguing that Defendants somehow were
making, not just reporting on, the allegations. 
Indeed, Grotti=s entire case seems to be
based on this faulty premise that Defendants accused her of euthanizing or
murdering patients, when in fact Defendants were reporting on the many
allegations and investigations of third parties.








The broadcasting of defamatory statements read
from a script is libel rather than slander.[7]  Libel is a defamatory statement that tends to
injure a living person=s reputation and thereby expose
the person to public hatred, contempt, ridicule, or financial injury, to
impeach any person=s honesty, integrity, virtue, or
reputation, or to publish the natural defects of anyone and thereby expose the
person to public hatred, ridicule, or financial injury.[8]  To maintain a cause of action for defamation,
the plaintiff must establish that the defendant (1) published a false statement
about the plaintiff; (2) that was defamatory; (3) while acting with either
actual malice, if the plaintiff was a public official or public figure, or
negligence, if the plaintiff was a private individual, regarding the truth of
the statement.[9]

A. 
Substantial Truth








AThe truth of the statement in
the publication on which an action for libel is based is a defense to the
action.@[10]  Similarly, a defendant may defeat a libel
claim by establishing the Asubstantial
truth@ of the
statement.[11]  The affirmative defense of substantial truth
is a complete defense with the burden of proof on the defendant.[12]
 To determine if a broadcast is
substantially true, we consider whether the alleged defamatory statement was
more damaging to the plaintiff=s
reputation, in the mind of the average person, than a truthful statement would
have been.[13]  We look at the Agist@ of a
broadcast to determine whether it is substantially true.[14]








AThe basis of the defense is
that, in order to protect a media defendant=s
constitutional right to free speech, an article or broadcast will not be
considered defamatory, even if some details are inaccurate, so long as the >gist= of the
report is substantially true.@[15]  If the underlying facts as to the gist of the
defamatory charge are undisputed, then we disregard any variance with respect
to items of secondary importance.[16]  When a case involves media defendants, as it
does here, to prove substantial truth, the defendants need only prove that the
third-party allegations were in fact made and accurately reported and that the
allegations were under investigation.[17]  Otherwise,

the media would be
subject to potential liability everytime it reported an investigation of
alleged misconduct or wrongdoing by a private person, public official, or
public figure.  Such allegations would
never be reported by the media for fear an investigation or other proceeding
might later prove the allegations untrue, thereby subjecting the media to suit
for defamation.[18]

 

Dr. Grotti states in her brief that she Arelies
on the >gist= of the
publications as a whole and not the isolated statements that the Media
Defendants attempt to extractCstanding
alone and out of contextCto demonstrate the defamation.@  We thus set out either a large portion of the
broadcasts or the broadcasts in their entirety.

 

 








1. 
June 28, 2001 Broadcast

The
first broadcast containing disputed statements aired on June 28, 2001.  Relevant portions of the broadcast are as
follows:

 

[News Anchor]:  A state investigation of [JPS] in Fort Worth
reveals more negligence in the hospital=s emergency room. 
A News 8 Investigation continues.

 

[News Anchor]:  Two months after News 8 began reporting on
the questionable care of ER patients inside the county hospital, the [TDH]
began its own review.

 

[News Anchor]:  Investigators found serious problems with four
deaths during a four-month period late last year. . . .

 

Valeri Williams:  Well, all of those deaths took place between
August and December of 2000.  Our
investigation uncovered two of those deaths back in November.  But even with what we found, there still were
surprises in what state authorities discovered. 
Now the state report does not identify the patients by name, but through
autopsy records and medical files, we=ve been able to identify three out of the four
patients.

 

. . . .

Valeri Williams:  Grandmother Lettie McGee is listed as patient
number eight.  She too ended up on life
support in the ER.  But state investigators
found that an ICU doctor came in, and in violation of state law, disconnected
McGee from the ventilator without ever telling her husband and daughter who sat
in the waiting room.  The report notes
that for an hour afterward, the patient continued to have a heart rate of 50
and difficult respirations.

 

. . . .








Valeri Williams: Lettie
McGee had cancer.  Her daughter, Wanda
Ragster, told us she would have made that decision to pull her mother off the
ventilator because the doctor told her that her mother was already brain dead.  Yet staff in the ER say that would have been
an impossible diagnosis to make, since determining brain activity requires an
EEG.  And an EEG test cannot be performed
in JPS=[s] emergency room.

 

Dr. Grotti argues that the gist of every
broadcast is that she was euthanizing or intentionally killing patients at
JPS.  We disagree.  Based on our review of the June 28, 2001
broadcast, we conclude that the gist of the report is that the TDH performed an
investigation into four deaths at JPS, that an unnamed ICU doctor, later
identified as Dr. Grotti, removed McGhee from a ventilator without first
consulting members of McGhee=s
family, in violation of state law, and that McGhee=s family
members expressed concerns regarding the doctor=s
actions.








The Media Defendants= summary
judgment evidence demonstrates that the gist of the broadcast is substantially
true.  A TDH report indicates that an ICU
physician (Dr. Grotti) removed a patient (McGhee) from the ventilator and
discontinued life-sustaining drugs without first discussing the move with the
patient=s
husband.  The report further indicates
that the patient=s husband, daughter, and son
were in the emergency room, that A[t]he
facility advanced directive policy requires the physician to include the
patient=s spouse
in making treatment decisions including withholding treatment or withdrawing
life-sustaining treatment,@ and
that Athe
hospital did not ensure [the] patient=s
rights.@  Willliams=s
affidavit states that during her first interview with McGhee=s
daughter, Wanda Ragster, Ragster indicated that she should have been given the
choice to remove her mother from the ventilator and that she would have made Athat
choice@ because
Dr. Grotti informed her that her mother had no brain activity.  Paula Martin and Jennifer Lovins, nurses who
assisted Dr. Grotti in treating McGhee, testified in their depositions that Dr.
Grotti disconnected McGhee from the ventilator and pronounced her dead but that
McGhee continued to breathe thereafter. 
The deposition testimony of Dr. Donald McGraw, M.D. demonstrates that
the ER is not equipped to determine brain death.  At no point during the broadcast did Williams
accuse Dr. Grotti of murdering McGhee.








In her reply brief, Dr. Grotti argues that the
Media Defendants are liable for the defamatory comments not subject to the
judicial/quasi-administrative proceeding privilege provided for in section
73.002 of the civil practice and remedies code and that liability attaches by
way of section 578 and section 581 of the Second Restatement of Torts.  However, Dr. Grotti provides us with no Texas
authority to support this contention, and after conducting our own independent
research, we were unable to locate any Texas authority supporting this
argument.  The case of Holloway v.
Butler[19]
discusses section 578 of the Second Restatement of Torts, but in the context of
determining the meaning of Apublication@ as it
pertains to the statute of limitations. 
We consequently reject Dr. Grotti=s
argument.[20]  Accordingly, because the broadcast accurately
reported on third-party allegations and an investigation involving Dr. Grotti,
the Media Defendants conclusively established their affirmative defense that
the gist of the June 28, 2001 broadcast was substantially truthful.[21]

2. 
August 2, 2001

The next broadcast containing disputed statements
aired on August 2, 2001.  Relevant
portions of the broadcast are as follows:

Valeri Williams:  You mean to say, she made a decision toCto make this man
die?  Not allow him to die, but to make
him die?

 

Kevin Wacasey: 
Yes.  In my opinion, yes.  She did.

[News Anchor]:  Another questionable death at [JPS].  And this Fort Worth doctor is one of several
staff members to say that hospital officials knew an employee was involved in
one suspicious death, did nothing, and it happened again. . . .

 








[News Anchor]:  . . . 
Now, a News 8 investigation confirms that Fort Worth homicide detectives
are investigating allegations that a JPS doctor has euthanized at least two
patients since December.

 

. . . .

Valeri Williams:  Well, both patients died in the intensive
care unit, and it=s the chief doctor over
that unit who is under police investigation. 
In January, when a state report concluded that the doctor had broken the
law by pulling a patient off life support without telling the family, the
hospital took no action.  When News 8
reported on the death last month, the doctor was finally suspended.  But in the meantime, another patient
suspiciously died.

 

Valeri Williams:  Woody O=Keefe was a thirty-three-year-old diabetic who
had a seizure in JPS=s emergency room.  He was transferred to intensive care on a
ventilator.  And his family says they
initially felt fortunate that O=Keefe was to be the patient of the ICU=s director, Dr. Lydia
Grotti.  But Dr. Grotti had some bad
news.

 

. . . .

Valeri Williams:  Woody=s aunt and grandmother say Dr. Grotti led them to
believe that O=Keefe was brain
dead.  In fact, Grotti wrote in the chart
that O=Keefe was, at the very
least, in a vegetative state, and that his outcome was dismal.  Yet, according to the medical file, Grotti
never ordered any neurological testing, like an EEG, to make such a
diagnosis.  The family then got O=Keefe=s autopsy and they were
stunned to read that Woody=s real cause of death was acute morphine
intoxication.

 

Dessie Wood:  That=s why I want to know that=s why they gave him so
much.

 

Shannon Hetter:  If he were truly brain dead and knew nothing,
what was the need of morphine? . . . .

 








Valeri Williams:  The family had never been told that Woody was
given morphine.  With their permission,
we gave O=Keefe=s medical file to several
doctors for review.  All of them termed O=Keefe=s death, at a minimum,
highly suspicious.  Kevin Wacasey is a
former emergency room physician at JPS.

 

Kevin Wacasey:  The chart reflects that the morphine was
administered for comfort care.  This
patient was, in the very least, comatose, and by Dr. Grotti=s own admission and
diagnosis, brain dead.  I don=t think he would have
felt it if you had set his feet on fire.

 

Valeri Williams:  There=s no doubt in your mind that this man was
euthanized?

 

Kevin Wacasey: 
No doubt.

Valeri Williams: 
Does that trouble you?

Kevin Wacasey: 
Very much so.

Valeri Williams:  Wacasey and other physicians tell News 8 that
the amount of morphine found in O=Keefe=s body was more than two times the lethal
dosage.  O=Keefe died in April.  In January, state investigators warned JPS
officials that Dr. Grotti had broken the law by yanking this sixty-five-year-old
grandmother off life support without telling her family as they sat in the ER
waiting room.  According to this report,
Lettie McGee continued to have a heart rate of fifty and difficult respirations
for another hour.  Still, Grotti did
nothing to try and keep the woman alive. 
She later told the family that McGee was brain dead.  Again, no neurological testing was ever done.

 

Kevin Wacasey:  The investigation that did take place through
the official hospital peer review committee at [JPS] in February of this year,
in my opinion, resulted in nothing.  And
it allowed Dr. Grotti the opportunity to do what she did to Mr. O=Keefe in April.

 

Dessie Wood: 
The main thing, is did he have to die right now?








Valeri Williams:  Homicide detectives are wondering the same
thing.  They say they will be pulling
files on other patients under Dr. Grotti=s care in the coming weeks.

 

Based on our review of the August 2, 2001 broadcast, we conclude that
the gist of the report is that homicide detectives with the FWPD were
investigating the deaths of two patients at JPS after allegations of euthanasia
were raised against Dr. Grotti.








The summary judgment evidence demonstrates that
the gist of the broadcast is substantially true.  Williams=s
affidavit testimony indicates that she was informed by a detective with the
Fort Worth Police Department that they were conducting a homicide investigation
of Dr. Grotti involving multiple deaths, and a lieutenant with the department
confirmed the existence of a Aserious
investigation@ before WFAA-TV aired any
reports about Dr. Grotti.  The affidavits
of Williams and Shucker indicate that a peer review committee investigated Dr.
Grotti and that JPS ultimately suspended her in June 2001Cbefore
the August 2, 2001 broadcast.  The
summary judgment evidence also contains a copy of O=Keefe=s
autopsy report, dated April 5, 2001, which shows that the deputy medical
examiner performed O=Keefe=s
autopsy and determined O=Keefe=s cause
of death to be acute morphine intoxication.      The
allegations of euthanasia in the broadcast are clearly attributable to third
parties, not Williams and WFAA-TV. 
Consistent with the report, Williams states in her affidavit that she
and Shucker asked three other doctors and a forensic pathologist to review O=Keefe=s
medical file.  Williams and Shucker also
questioned the doctors regarding McGhee=s
death.  Williams=s
affidavit indicates that two of the doctors and the pathologist concluded that
Dr. Grotti had euthanized O=Keefe by
giving him an overdose of morphine, and another doctor, after only a cursory
review of the file, believed that Dr. Grotti=s
actions were highly suspicious.  They
also reasoned that occluding McGhee=s ET
tube would have suffocated McGhee.  The
allegations levied against Dr. Grotti are also partly attributable to members
of the O=Keefe
family, who expressed concern about Dr. Grotti=s
treatment of O=Keefe.  Williams=s
affidavit indicates that she interviewed members of O=Keefe=s family
and that they Adid not understand why [O=Keefe]
would have been given morphine for pain given the condition he was in and given
that they had been told that he was brain dead.@ 








Lastly, the portion of the report that mentions
McGhee simply recounts information obtained from the TDH report that was
previously aired in the June 28, 2001 broadcast.  And Williams=s
statement in the August 2 report that Dr. Grotti Ayank[ed]@ McGhee
off of the ventilator as opposed to her statement in the June 28 report that
she Adisconnected@ McGhee
from the ventilator is of no consequence to our determination regarding the
substantial truth of the broadcast. 
Williams did not accuse Dr. Grotti of euthanizing O=Keefe or
McGhee in the broadcast.  Accordingly,
because the broadcast accurately reported on third-party allegations and
multiple investigations involving Dr. Grotti, the Media Defendants conclusively
established their affirmative defense that the gist of the August 2, 2001
broadcast was substantially truthful.[22]         3.  August 3, 2001 Broadcast

The next broadcast containing disputed statements
aired on August 3, 2001.  Relevant
portions of the broadcast are as follows:

[News Anchor]:  Here, at home, Fort Worth police are
investigating two suspicious deaths at [JPS].

 

[News Anchor]:  An intensive care doctor allegedly euthanized
two of her patients, but the doctor who turned her in is the doctor out of a
job.

 

. . . .

Valeri Williams:  Well, David Cecero had been on the job only
four days when this latest wave of controversy hit the hospital.  It didn=t happen on his watch, but now Cecero is the guy
who=s got to get to the
bottom of it.  Dr. Kevin Wacasey is a
father of four.  Earlier this week, he
was marched out of JPS= emergency room by two
armed officers and told not to come back. 
Five days prior, Wacasey had turned Dr. Lydia Grotti in to police for a
second suspicious death.

 








Kevin Wacasey:  Physicians and other healthcare professionals
are literally required to report physicians or other healthcare professionals
whom they believe represent a danger to public health and safety.  In my opinion, this was a graveCa matter of grave public
concern and I wanted to make sure that this individual, since she was not being
appropriately disciplined and appropriately supervised within the hospital
setting itself, I wanted to insure that she did not have the opportunity to do
what she has done.

 

Valeri Williams:  In January, state investigators warned JPS in
this report that Grotti had taken this grandmother off life support without
telling her family who was sitting in the ER waiting room.  In February, Grotti was summoned to a peer
review hearing over the death.  Hospital
officials did nothing.  And Grotti
continued to have access to patients.  In
April, Woody O=Keefe was injected with
lethal doses of morphine after Grotti pulled him off life support.  But it wasn=t until July, following a
News 8 investigation, that Grotti was finally put on suspension.  She has declined comment for this report.

 

David Cecero:  I take this very seriously.  So, yeah. 
There are questions that you are putting on the table here that are very
good questions, very legitimate questions.

 

. . . .

David Cooke:  That=s the nature of people who do emergency medicine.

 

Valeri Williams:  David Cooke filed a complaint with the State
Board of Medical Examiners against JPS=[s] former emergency room director for the doctor=s role in the deaths of
three patients and other alleged incidents.

 

Nat Baumer: 
No comment.

Valeri Williams:  This summer, the state board severely
restricted Nat Baumer=s medical license.  Yet, JPS took no action against Baumer.  Instead, Dr. Cooke has been summoned before
more than a dozen hospital review committees since filing the complaint.

 

Valeri Williams: 
What are you hoping that this new CEO will do?








Kevin Wacasey:  I hope that he takes into consideration these
issues, doesn=t listen to the powers
that be there.  That he looks at it from
having outside experience where hospitals run correctly or at least closer to
correct than this one does.  And I hope
he makes vast, sweeping, necessary changes.

 

David Cecero:  I don=t want to sound apologetic, but I=ve only been here four
days.  And in four days, does not a world
turn.

 

Valeri Williams:  Cecero told us that waiting more than four
months to suspend Dr. Grotti was perhaps too long.  While on suspension, she continues to be
paid.  Under a termination agreement,
Kevin Wacasey=s last paycheck will come
in October.  Given the chance to keep his
job or do what he thinks was right, Wacasey has never looked back.

 

The physicians group at
JPS which fired Wacasey, refused to talk about his termination, except to deny
that his role in the Grotti case played a role. 
Today, police told us that more families of patients under the doctor=s care have come forward
to report suspicious deaths.

 

Based on our review of the August 3, 2001 broadcast, we conclude that
the gist of the report is that Fort Worth police were investigating two
suspicious deaths, which were reported by Dr. Wacasey, whose employment JPS had
recently terminated.








Again, the summary judgment evidence demonstrates
that the gist of the broadcast is substantially true.  Dr. Wacasey=s
deposition testimony indicates that he reported Dr. Grotti to the TDH and later
to the FWPD.  Williams=s
references to Dr. Grotti=s alleged misconduct involving
McGhee and O=Keefe have their basis in the
TDH report as it relates to McGhee, JPS=s
investigation of Dr. Grotti by a peer review committee, and O=Keefe=s autopsy
report showing that his cause of death was acute morphine intoxication.  The remaining portion of the report=s gistCthat Dr.
Wacasey was terminated by JPSCis not
challenged by Dr. Grotti and is therefore undisputed.  Accordingly, the Media Defendants
conclusively established their affirmative defense that the gist of the August
3, 2001 broadcast was substantially truthful.[23]

4. 
Sept. 24, 2001 Broadcast

The next report containing disputed statements
aired on September 24, 2001.  It reads as
follows:

[News Anchor]:  A News 8 investigation has uncovered more
evidence in the case of a hospital doctor accused of euthanizing her patients.

 

[News Anchor]:  Dr. Lydia Grotti is an ICU physician at [JPS]
who has been on paid suspension while a special prosecutor investigates the
death of two patients.  Channel 8's
Valeri Williams reveals a document in which the doctor admits to blocking the
airway of an elderly patient until the woman stopped breathing.

 








Valeri Williams:  The night after Christmas last year,
sixty-four-year-old Lettie McGee lay on a gurney in the emergency room, while
staff at JPS repeatedly fought to save her. 
Two, three, maybe four times they had to revive her.  But eventually, they say, they had McGee
clinging to life on a ventilator.  Then
Dr. Lydia Grotti from the hospital=s ICU took over. 
And what happened next stunned them all. 
Without consulting McGee=s family who sat just outside in the waiting
room, Grotti disconnected McGee from the ventilator.  Yet documents show that the grandmother
continued to breathe on her own and have a pulse for at least an hour until the
doctor showed up again.  According to
sources, witnesses have told police that Grotti then placed her thumb, like
this, over the tube coming out of McGee=s mouth, which cut off McGee=s supply of oxygen.  In a statement to the State Board of Medical
Examiners, Grotti admitted that she occluded the endotracheal tube for
approximately one minute.  Grotti states
she did this because the ET tube was prolonging the agony for the family and
emergency department staff, who wanted the patient moved somewhere else.  There was no room.

 

Valeri Williams:  Is there any reason that you can think of,
that a doctor would be doing this?

 

Kevin Wacasey: 
No.

Valeri Williams: 
Not at all?

Kevin Wacasey:  None. 
I can=t think of anyCI mean, I really cannot
think of any reason why a physician, a nurse, a technician, anybody would want
to do this to someone.

 

Valeri Williams:  An independent forensic pathologist and other
doctors contacted by News 8 concur with Dr. Kevin Wacasey=s statement.  Wacasey was fired from JPS earlier this
summer, one day after reporting Grotti to authorities.  However, Dr. Grotti=s attorney says Grotti
denies all allegations against her.  In a
letter to News 8, the attorney says that an unnamed medical expert retained by
them has concluded that McGee was already dead prior to the doctor=s arrival in the ER.  The letter states that Dr. Grotti=s actions, with respect
to the treatment of Ms. McGee, were appropriate and within the standard of
care.  And that blocking the ET tube
would have no effect on this already deceased patient.  But other medial professionals argue that if
Lettie McGee was already dead, there would have been no reason to cut off the
patient=s air supply.

 








Kevin Wacsey:  The fact that she did that overt act to
hasten that patient=s death, in my mind, is
an irreversible damnation of her activities.

 

Valeri Williams:  Next week, Grotti has a hearing before the
hospital board regarding her paid suspension. 
But in recent days, the doctor=s legal woes have continued to worsen.  Earlier this month, the Tarrant County
Medical Examiner revised this patient=s death from an accidental overdose of morphine
to homicide. . . .

 

[News Anchor]:  The special prosecutor brought in from Harris
County to review the suspicious deaths tells News 8 that he will be in Fort
Worth within the next two weeks to begin his investigation.

 








After our review of the September 24, 2001 broadcast, we conclude that
the gist of the report is that witnesses accused Dr. Grotti of occluding McGhee=s ET
tube with her thumb and that Williams obtained a document containing Dr. Grotti=s
statement that she had occluded McGhee=s ET
tube with her thumb.       The summary
judgment evidence demonstrates that the gist of the broadcast is substantially
true.  Williams reported on the occlusion
of McGhee=s ET tube for the first time in
the September 24, 2001 broadcast after she obtained Dr. Grotti=s
statement that Dr. Grotti occluded McGhee=s ET
tube.  In the document, Dr. Grotti
states, AInstead
of removing the ETT, which the Medial Examiner did not want us to do, I
occluded the ETT for approx. one minute.@  Before the broadcast, Williams also conducted
additional research and interviewed numerous JPS staff, including nurses who
indicated in their deposition testimony that JPS staff questioned Dr. Grotti=s
occlusion of McGhee=s ET tube in the days after it
occurred.  The circumstances detailed by
Williams leading up to Dr. Grotti=s
occlusion of McGhee=s ET tubeCthat JPS
staff revived McGhee, that Dr. Grotti disconnected her from the ventilator, and
that McGhee continued to breatheCoriginated
from Williams=s interviews of other JPS staff
(including Dr. McGraw and ER nurses and technicians), the TDH report discussed
above, and conversations with a detective.

Regarding Williams=s concluding
remarks, the summary judgment evidence shows Williams learned that an
independent prosecutor had been appointed to investigate the Asuspicious
deaths@ and
that O=Keefe=s
autopsy report was revised to indicate that his manner of death was a
homicide.  The report does not accuse Dr.
Grotti of euthanizing McGhee or O=Keefe.

Accordingly, because the broadcast accurately
reported third-party allegations directed at Dr. Grotti regarding the occlusion
of McGhee=s ET tube and the investigations
associated therewith, the Media Defendants conclusively established their
affirmative defense that the gist of the September 24, 2001 broadcast was
substantially truthful.[24]

 

 








5. 
March 15, 2002 Broadcast

The next broadcast containing disputed statements
aired on March 15, 2002.  It reads as
follows:

[News Anchor]:  It was more than a year ago that a
64-year-old grandmother was unplugged from life support and allegedly left to
die inside the emergency room at [JPS] in Fort Worth.  Since then, seven more suspicious deaths have
surfaced involving one hospital physician. 
But tonight in a New[s] 8 investigation, Valeri Williams reports that
efforts are underway to try to clear the doctor.

 

Valeri Williams:  The night Lettie McGee died, her family sat
at JPS=s emergency room never
knowing that she had been unplugged from a ventilator or that she was near
death.  Records show McGee fought to
breathe on her own for nearly an hour. 
The image of their mother dying slowly and alone still haunts McGee=s daughters.

 

Ava McGee:  At least if she was on a monitor or
something, we could talk to her or hold her hand, or rub her arm, listen to her
heart beat.  You know?

 

Valeri Williams:  Unplugging a patient from life support
without a family=s permission is a
violation of state law and hospital policy, but even more horrifying to the
family is what happened next.  Lydia
Grotti was McGee=s doctor.  In a written statement Grotti admits that she
took her thumb and placed it over McGee=s airway tube for approximately one minute.  Grotti says she did nothing wrong and claims
the patient was already dead.  But four
different physicians have told News 8 that this is a medically unapproved
procedure.

 

Despite these factors,
the hospital=s Peer Review Committee
is recommending to JPS=s Board of Managers that
Dr. Grotti be cleared in McGee=s death. 
The Peer Review Committee is a secret, but powerful group of doctors,
which is supposed to investigate bad patients outcomes.








But at JPS, a lawsuit
recently accused the Committee of making decisions based on hospital politics.

 

Wanda Ragster: 
I just want to know the truth. 
AndC

Valeri Williams:  At this point do you think you are going to
get the truth from the hospital?

 

Wanda Ragster: 
From the way it seems right now, no.

Valeri Williams:  The Peer Review Committee=s recommendation to clear
Dr. Grotti raises the concern of how much investigation is really going on into
a total of eight suspicious deaths at JPS. 
News 8 has discovered that in the past 6 months neither the police nor
an independent prosecutor appointed to the case has interviewed McGee=s family.

 

Ava McGee:  Nobody called or asked any questions or even
contacted us about anyChe never asked usCI mean, nobody said
anything to us.

 

Valeri Williams:  News 8 has also learned that the independent
prosecutor has never sent the files of the dead patients off for review by
medical experts.  Shannon Hetter=s nephew died after being
given 2.5 times the lethal dosage of morphine. 
[The] [m]edical examiner ruled his death a homicide.

 

Shannon Hetter:  How long is this going to take?  Is it going to be two years before we go to
grand jury?  Are you seriously working on
this?  He did assure me that he would
investigate it thoroughly.

 

Valeri Williams: 
Do you believe that today?

Shannon Hetter:  It=s a little hard to believe today.  After this period of time.

 








Valeri Williams:  The Tarrant County District Attorney=s office recused itself
from the Grotti case in August because it=s legally required to represent the public
hospital and therefore can=t investigate it. 
However, it was the DA=s office that selected the independent
prosecutor.

 

Marvin Collins:  Once we step aside, it is out of our
hands.  So we don=t have any ability to go
back and say we change our mind.

 

. . . .

Shannon Hetter:  What do you have to do to be punished for
your behavior in the medical profession?

 

Valeri Williams:  For the families there is tremendous anxiety
that the longer the investigation takes the more likely people are to
forget.  And at this point, they are
suspicious that that is exactly what county officials want.

 

Valeri Williams, Channel 8 NewsCFort
Worth.

[News Anchor]:  The independent prosecutor assures everyone
involved that his investigation continues.

 








After our review of the March 15, 2002 broadcast, we conclude that the
gist of the report is that there were a number of suspicious deaths involving
Dr. Grotti at JPS, that the JPS Peer Review Committee was recommending that Dr.
Grotti be cleared of McGhee=s death,
and that independent investigations by authorities into the deaths of McGhee
and O=Keefe
were proceeding slowly.       Initially,
we note that the report=s indication that the Peer
Review Committee was recommending that Dr. Grotti be cleared of McGhee=s death
and the additional statements regarding the investigations by law enforcement
officials into the deaths of McGhee and O=Keefe
are statements describing an investigation and not allegations directed at Dr.
Grotti capable of injuring her reputation.[25]  Dr. Grotti argues that the statement made
during the introduction to the report that Aseven
more suspicious deaths have surfaced involving one hospital physician@ implied
that Dr. Grotti Awas responsible for >eight
suspicious deaths at JPS.=@  Dr. Grotti contends that Williams did not
state the basis for this Aallegation@ in the
report and that A[m]aterial facts underlying this
allegation were omitted.@ 
We disagree.  The complained of
statement is not an allegation, literally or impliedly, but an update that
additional suspicious deaths involving Dr. Grotti are being investigated.  Williams stated in her affidavit that she
learned in her discussions with the independent prosecutor that authorities
were Ainvestigating
not only the deaths of Ms. McGhee and Mr. O=Keefe,
but also six other suspicious deaths involving Dr. Grotti.@  Indeed, Dr. Grotti admitted during her
deposition testimony that in addition to the deaths of McGhee and O=Keefe,
she was being investigated for seven other deaths.  Because the disputed statement is not merely
an unsubstantiated allegation, Dr. Grotti=s
argument that material facts associated therewith were omitted is without
merit.








The statements that McGhee had been unplugged
from a ventilator, that her family waited in the emergency room, that McGhee
continued to breathe on her own for Anearly
an hour,@ that
removing a patient from life support without first consulting the family
violates state law and hospital policy, and that Dr. Grotti occluded McGee=s ET
tube have all been shown to be substantially true in the above sections
according to the TDH report, Dr. Grotti=s
statement that she occluded McGhee=s ET
tube, and the affidavits of Williams and Shucker.  Contrary to Dr. Grotti=s
arguments, the Media Defendants did not accuse her of killing McGhee, O=Keefe,
or the other six individuals whose Asuspicious
deaths@ were investigated.  Accordingly, the Media Defendants
conclusively established their affirmative defense that the gist of the March
15, 2002 broadcast was substantially truthful.[26]

6. 
August 5, 2002 Broadcast

The next broadcast containing disputed statements
aired on August 5, 2002.  It reads as
follows:

[News Anchor]:  Another family of a Fort Worth hospital
patient who died in the emergency room has filed a lawsuit charging the Tarrant
County Hospital District, a physicians group, and a doctor with
negligence.  Patient deaths continue to
be the subject of four investigations which began last year.  Victims= families complained that authorities have done
little to look into the case.  The doctor
insists she has never done anything to harm a patient.  Tonight, Channel 8's Valeri Williams brings
us one eye witness account of what happened that night as News 8 investigates.

 








ER Tech:  Yeah. 
They walked in and saw her in that condition.  She was still breathing, still had a heart
rate.

 

Wacasey: 
Oh, my God.  Holy cow.

ER Tech:  And I was goingCAnd I told myselfCI was like, you know, I
want to leave right now.  I don=t want to be no part of
this.

 

Valeri Williams:  The tape was recorded nearly a year ago by
Kevin Wacasey, the former JPS hospital physician who reported Dr. Lydia Grotti
to authorities.  Wacasey has accused
Grotti of euthanizing two hospital patients. 
One, a thirty-three-year-old diabetic man who died in April of 2001, and
the other, an elderly grandmother who died in December of 2000.  Wacasey claims he was fired from the hospital
because he reported the ICU doctor to police. 
He says that prompted him to collect this evidence.  So Wacasey taped a phone call with an
emergency room technician who witnessed Dr. Grotti=s treatment of Lettie
McGee, a patient on life support.  He did
not tell the technician he was recording her.

 

ER Tech: 
And she=s like, well, I=m not
taking this patient to ICU.

Wacasey: 
Whoa.  She said that right there?

ER Tech:  Yes. 
She goes, I=m not taking this patient
to ICU.  I=llC  I=ll have to take her off the vent in the morning,
so I might as well do it now.  I=ll take full
responsibility for this patient.  I=ll put my name on the
chart.  Went over there, took her off the
vent.  Never told the family anything.

 

Valeri  Williams: Grotti adamantly denies any
wrongdoing.  However, state investigators
report Grotti violated the law when she removed McGee from life support without
the family=s permission.  McGee=s daughter and grandson sat close by in the ER=s waiting room.

 

ER Tech:  I mean, everybody was, like, what the [blank]
is she doing?

 








Valeri Williams:  This is the first time they have heard an
insider=s description of what was
happening behind closed doors.

 

Wanda Ragster:  It don=t make any sense to me.  It really don=t make any sense to me
that they, that whoever didn=t care enough to see if she would keep
living.  JustCjust like she wasn=t anything.

 

Valeri Williams:  Attorneys for Grotti claim she is an innocent
bystander dragged into Wacasey=s efforts to retaliate against the hospital.  They note Wacasey recently dropped his
lawsuit against JPS.  In June, Grotti
filed a lawsuit over Channel 8's past reports. 
In a letter to the station, Grotti attorneys state: Dr. Grotti has never
in her entire career done any act that would cause or contribute to the death of
any of her patients.  The attorneys also
write that all of the medical records in this case support the fact that Ms.
McGee expired at least one hour before Dr. Grotti ever laid eyes on her.  And that much of what the ER tech observed,
occurred after Ms. McGee=s death.  They also say the ER tech is incorrect and
does not possess the qualifications to determine the quality of patient
care.  But the tech, who has an EMT
license in life saving, is unwavering in what she saw.

 

ER Tech:  And after she did all her stuff, she goes,
well, call me when the patient expires so I can go talk to the familyCand left.  And went back to the ICU.

 

Wacasey: 
Call me when the patient expires?

ER Tech: 
Yes.

Wacasey: 
This is after she removed her from the ventilator?

ER Tech: 
Yes.








Valeri Williams:  According to a lawsuit filed last month by
the family, Grotti began filling out a medical report stating McGee was dead
while the grandmother was still breathing. 
Then, in her own words, Dr. Grotti admitted to the State Board of
Medical Examiners that she blocked the patient=s airway tube for
approximately one minute.

 

Wanda Ragster:  It=s like she has no heart.

 

Valeri Williams:  The ER tech still works for JPS and did not
want to be interviewed on camera for this story.  However, she has confirmed her statements on
the tape to News 8, and she says she has been videotaped by police saying the
same thing.

 

And that brings up a sore
subject for everyone involved in this case, including Dr. Grotti.  It=s been a year since the police, a special
prosecutor, the hospital, and the State Board of Medical Examiners all began
separate investigations into the patient deaths.  Not one of them has issued any findings,
whether they would clear Dr. Grotti or keep her from seeing more patients.  Valeri Williams.  Channel 8 News.

 

[News Anchor]:  JPS officials say they have been
investigating McGee=s death since February of
last year.  However, the ER tech told
News 8 that no one from the hospital has questioned her about what she
witnessed that night.  All hospital
officials declined to comment for tonight=s story, citing the pending investigations and
litigation.

 

After our review of the August 5, 2002 broadcast, we conclude that the
gist of the report is that investigations of patient deaths involving Dr.
Grotti at JPS remained in progress, that members of McGhee=s family
filed a lawsuit against Dr. Grotti and others, that an ER technician who
witnessed the events surrounding McGhee=s death
was recorded on audiotape describing what transpired that night, and that Dr.
Grotti denied any wrongdoing in the deaths under investigation.








The gist of the broadcast is substantially true.  Members of the McGhee family sued Dr. Grotti,
alleging that McGhee was still alive when Dr. Grotti discontinued treating her
and that Dr. Grotti occluded the ET tube of McGhee in order to stop her
respirations.  The broadcast, however,
merely reported that the lawsuit charged Dr. Grotti and others with negligence;
it did not address the specific allegations contained in the petition.  Likewise, as discussed above, that an
investigation into the deaths at JPS continued is not defamatory.[27]  The statements made by Kimberly Short, the ER
technician describing the events surrounding McGhee=s death,
are clearly the words of ShortCa third
partyCand not
those of the Media Defendants. 
Nonetheless, Short=s deposition testimony indicates
that she made identical remarks in a statement to Fort Worth police and that
the statements were true and accurate.

The broadcast did not accuse Dr. Grotti of
killing her patients; it accurately reported third-party allegations and the
status of pending investigations relevant thereto.  Accordingly, the Media Defendants
conclusively established their affirmative defense that the gist of the August
5, 2002 broadcast was substantially truthful.[28]

 








7. 
August 15, 2002 Broadcast

The next broadcast containing disputed statements
aired on August 15, 2002.  It reads as
follows:

[News Anchor]:  A Fort Worth based doctor accused of
euthanizing two hospital patients has been temporarily stripped of her medical
license by state officials.  Dr. Lydia
Grotti continues to deny that she ever harmed any patients. However, today a
disciplinary panel with the State Board of Medical Examiners in Austin, said
that she is a continuing threat to the public welfare.  Tonight, Channel 8's Valeri Williams has more
as News 8 investigates.

 

Keith Ward:  Dr. Grotti does not care to give a statement
at this time.

 

Valeri Williams:  Lydia Grotti left immediately following the
state board=s decision to temporarily
suspend her license.  Evidence presented
during the two-day hearing included revelations that the doctor had once been
confined to a military psychiatric facility for more than a month, and had been
diagnosed with a narcissistic personality disorder.  Grotti was involuntarily discharged from the
Air Force.

 

Keith Ward:  I don=t think anyCany qualified professional has ever found that
any part of her psychological make up has in any way has interfered with her
ability to treat patients.  And I don=t believe that would be
accurate toCto suggest that it does.

 








Valeri Williams:  But State Board attorneys noted for the
record that during the past year, three out of four different psychiatrists
found that Grotti needed psychiatric help, and at the hearing, one was quoted
as saying that Grotti showed a total lack of appropriate sensitivity, which
presents serious implications for assignments and responsibilities with
patients.  The record showed that the
same information was made available to officials at John Peter Smith Hospital
in Fort Worth.  Yet, a peer review committee
there recommended reinstating her privileges so she could see patients
again.  However, the hospital board
overruled that recommendation.

 

Valeri Williams:  Let me ask you point-blank, did your client
euthanize those patients?

 

Keith Ward: 
Let me tell you in one word, no.

Valeri Williams:  The State Board temporarily suspended Grotti=s license based on
evidence presented in the deaths of two patients.  One was a Fort Worth grandmother who the
doctor took off life support without the family=s permission.  Grotti admits to blocking the patient=s airway tube, like this,
cutting off all oxygen to the elderly woman. 
She claims the woman was already dead. 
But this former JPS physician testified that the patient had a pulse and
was breathing when he handed over care to Grotti.  Unheard before now is Grotti=s claim that a JPS nurse
was the first person to block the tube with a piece of paper.

 

The other patient was a
thirty-three-year-old diabetic who=s death has been labeled a homicide by the
Tarrant County Medical Examiner due to acute morphine intoxication.  However, Grotti testified Woody O=Keefe did not receive an
unusually high or toxic dose.  She told
the Board that she increased O=Keefe=s morphine levels because the comatose patient
had air hunger, and the family instructed her not to let him suffer.  But O=Keefe=s aunt, who came to watch the proceeding, says
the family never asked for nor was ever told about the morphine.

 

Shannon Hetter:  Because Woody showed no pain whatsoever.  I mean we would have never said he was in
pain.  He was a diabetic.  They don=t often give morphine to diabetics.  So that was a total surprise, and when I did
get the medical examiner=s report, I thought they
had the wrong person when they talked about an overdose of morphine.

 








Valeri Williams:  The State Board=s action is the first
time in more than a year that anyone has acted to stop Dr. Grotti from seeing
more patients at other hospitals. 
However, patients= families and medical
professionals who challenge Grotti, say the system has failed them when it
comes to the criminal investigation. 
Thus far, a special prosecutor from Houston has spent only five days out
of the past eleven months in Fort Worth working on the case.  Even Grotti=s own attorney said
during the hearing that a criminal investigation is proceeding at a crawl, and
they believe she will never be charged. 
Valeri Williams.  Channel 8 News.  Austin.

 

[News Anchor]:  Dr. Grotti will remain on suspension until
the review hearing at the end of September.

 

After our review of the August 15, 2002 broadcast, we conclude that
the gist of the report is that the Texas State Board of Medical Examiners
temporarily suspended Dr. Grotti=s
medical license because of her involvement in the deaths of McGhee and O=Keefe.








Williams=s
affidavit indicates that she attended Dr. Grotti=s
hearing before the Disciplinary Panel of the Board of Medical Examiners in
August 2002.  The broadcast begins by
detailing portions of the evidence presented during the hearing, including
certain aspects of Dr. Grotti=s mental
health history.  Findings of fact 31 and
32 in the temporary suspension order and parts of Dr. Grotti=s
deposition testimony demonstrate the accuracy of these statements.  Williams next asked Dr. Grotti=s
attorney if Dr. Grotti euthanized McGhee and O=Keefe;
she did not assert that Dr. Grotti euthanized McGhee and O=Keefe.  The report continues by describing the events
surrounding the deaths of McGhee and O=Keefe,
which we have already analyzed in detail above. 
The report concludes by mentioning the status of the criminal
investigation into Dr. Grotti=s
actions, which we have also discussed at length above.  The broadcast thus accurately reported on the
Board of Medical Examiners=
decision to temporarily suspend Dr. Grotti=s
medical license; it did not accuse Dr. Grotti of euthanizing her patients.  Accordingly, the Media Defendants
conclusively established their affirmative defense that the gist of the August
15, 2002 broadcast was substantially truthful.[29]

8.  Overall
Holding








In sum, the Media Defendants conclusively
established their affirmative defense that the gist of each of the seven
broadcasts was substantially truthful as a matter of law.  Accordingly, the trial court did not err by
granting the Media Defendants= motion
for summary judgment.[30]  Moreover, because the trial court did not
specify the ground upon which it based its ruling, we affirm the summary
judgment solely on this meritorious theory and do not decide whether Dr. Grotti
is collaterally estopped from arguing that she did not cause McGhee=s death,
whether the broadcasts are privileged, whether Dr. Grotti is a public official
and public figure, and whether the Media Defendants acted with malice.[31]  We overrule Dr. Grotti=s fourth
issue and do not reach her first, fifth, sixth, and seventh issues.

B. 
Excluded Summary Judgment Evidence

In her second and third issues, Dr. Grotti argues
that the trial court erred by excluding portions of the evidence that she
submitted in opposition to the Media Defendants= motion
for summary judgment.  However, even if
we disregarded the Media Defendants=
objections to Dr. Grotti=s summary judgment evidence and
the trial court=s rulings thereon and considered
Dr. Grotti=s summary judgment evidence, the
Media Defendants would still be entitled to summary judgment because they conclusively
proved their affirmative defense of substantial truth as a matter of law.[32]  Accordingly, we overrule Dr. Grotti=s second
and third issues.

 

 

 

 

 








IV.  Conclusion

Having disposed of all of Dr. Grotti=s
issues, we affirm the trial court=s
judgment.

 

 

LEE
ANN DAUPHINOT

JUSTICE

PANEL A:   CAYCE, C.J.; DAUPHINOT and MCCOY, JJ.

DELIVERED:  March 9, 2006

 











[1]Tex. R. Civ. P. 94; Nowak v. DAS Inv. Corp., 110 S.W.3d 677,
679-80 (Tex. App.CHouston [14th Dist.] 2003, no pet.).





[2]Tex. R. Civ. P. 166a(c); Sw. Elec. Power Co. v. Grant, 73
S.W.3d 211, 215 (Tex. 2002); City of Houston v. Clear Creek Basin Auth.,
589 S.W.2d 671, 678 (Tex. 1979).





[3]Sw. Elec. Power Co., 73 S.W.3d at 215.





[4]Great Am. Reserve Ins. Co. v. San Antonio Plumbing
Supply Co., 391 S.W.2d 41, 47 (Tex.
1965).





[5]KPMG Peat Marwick v. Harrison County Hous. Fin. Corp., 988 S.W.2d 746, 748 (Tex. 1999).





[6]Carr v. Brasher,
776 S.W.2d 567, 569 (Tex. 1989).





[7]Christy v. Stauffer Publ=ns, Inc., 437 S.W.2d 814, 815 (Tex. 1969).





[8]Tex. Civ. Prac. & Rem.
Code Ann. ' 73.001 (Vernon 2005).





[9]Dolcefino v. Randolph, 19 S.W.3d 906, 917 (Tex. App.CHouston
[14th Dist] 2000, pet. denied).





[10]Tex. Civ. Prac. & Rem.
Code Ann. ' 73.005.





[11]McIlvain v. Jacobs, 794 S.W.2d 14, 15-16 (Tex. 1990); Randolph, 19 S.W.3d at 918.





[12]Cram Roofing Co. v. Parker, 131 S.W.3d 84, 90 (Tex. App.CSan
Antonio 2003, no pet.).





[13]McIlvain,
794 S.W.2d at 16; Randolph, 19 S.W.3d at 918.





[14]McIlvain,
794 S.W.2d at 16; Randolph, 19 S.W.3d at 918; KTRK Television v.
Felder, 950 S.W.2d 100, 105-06 (Tex. App.CHouston [14th Dist.] 1997, no writ).





[15]Britton Cherish Walters v. Columbia/St. David=s
Healthcare Sys., L.P., No.
03-03-00582-CV, 2005 WL 1240968, at *6 n.6 (Tex. App.CAustin
May 26, 2005, pet. filed).





[16]McIlvain,
794 S.W.2d at 16.





[17]Id.; Dolcefino
v. Turner, 987 S.W.2d 100, 109 (Tex. App.CHouston [14th Dist.] 1998), aff=d, Turner v. KTRK Television, Inc., 38
S.W.3d 103 (Tex. 2000); Felder, 950 S.W.2d at 106; see also Green v.
CBS Inc., 286 F.3d 281, 283-84 (5th Cir. 2002); Associated Press v. Boyd,
No. 05-04-01172-CV, 2005 WL 1140369, at *2 (Tex. App.CDallas
May 16, 2005, no pet.).





[18]Felder, 950
S.W.2d at 106.

 





[19]662 S.W.2d 688, 692 (Tex. App.CHouston
[14th Dist.] 1983, writ ref=d n.r.e.).





[20]See Tex. R. App. P.
38.1(h).





[21]See McIlvain,
794 S.W.2d at 16; Felder, 950 S.W.2d at 106.





[22]See McIlvain,
794 S.W.2d at 16; Felder, 950 S.W.2d at 106.





[23]See McIlvain,
794 S.W.2d at 16; Felder, 950 S.W.2d at 106.





[24]See McIlvain,
794 S.W.2d at 16; Felder, 950 S.W.2d at 106.





[25]See Tex. Civ. Prac. & Rem. Code Ann. ' 73.001.





[26]See McIlvain,
794 S.W.2d at 16; Felder, 950 S.W.2d at 106.





[27]See Tex. Civ. Prac. & Rem. Code Ann. ' 73.001.





[28]See McIlvain,
794 S.W.2d at 16; Felder, 950 S.W.2d at 106.





[29]See McIlvain,
794 S.W.2d at 16; Felder, 950 S.W.2d at 106.





[30]See KPMG, 988 S.W.2d at 748.





[31]See Tex. R. App. P.
47.1; Carr, 776 S.W.2d at 569.





[32]See KPMG, 988 S.W.2d at 748 (stating that defendant is
entitled to summary judgment on an affirmative defense if the defendant
conclusively proves all the elements of the defense); Felder, 950 S.W.2d
at 108.